UNITED STATES of America, Plaintiff, Appellee,

v.

LUMBERMENS MUTUAL CASUALTY COMPANY, INC., Defendant, Appellee.

Ossipee Insurance Agency, Inc., Third–Party Defendant, Appellant.

No. 89–2004.

United States Court of Appeals, First Circuit.

Heard May 10, 1990.

Decided Oct. 30, 1990.

Francis G. Murphy, Jr., with whom David W. Hess, and Nixon, Hall & Hess Professional Association, Manchester, N.H., were on brief, for appellant.

Gretchen Leah Witt, Asst. U.S. Atty., with whom Jeffrey R. Howard, U.S. Atty., Concord, N.H., was on brief for the U.S.

David Woodbury, Bedford, N.H., for defendant, appellee.

Before CAMPBELL, Circuit Judge, BOWNES, Senior Circuit Judge, and TORRUELLA, Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

After a fire destroyed a house and barn on real estate owned by the Veterans Administration (the "VA"), the VA sued an insurance company, Lumbermens Mutual Casualty Company ("LMC"), for coverage under a homeowner's policy that LMC had issued to a prior owner of the property. LMC defended in part on the ground that, as the VA was not named in the insurance contract, it had no right to recover under the policy. LMC also brought third-party actions against its insurance agent, Ossipee Insurance Agency, Inc. ("Ossipee"), and a plumber who allegedly started the fire.

After a bench trial, the district court rejected the VA's proposed theory of recovery—that LMC was estopped from claiming that the VA was not a party to the insurance contract. The court held, however, *sua sponte*, that the evidence warranted reforming the policy to substitute the VA for the named insured. The court awarded the United States damages of $48,570.90 against LMC. It further held that Ossipee and the plumber were jointly and severally

liable to LMC in its third-party actions. Only Ossipee appealed.

We hold that the district court did not err in rejecting the VA's estoppel theory, but that it did err in ordering reformation of the insurance contract. We, therefore, reverse the judgment against appellant Ossipee, as it was premised on an erroneous judgment entered against LMC. Because LMC (and the plumber) chose not to appeal from the judgments entered against them, we do not disturb those judgments.

## I. BACKGROUND

The principal facts are as follows:

1. In early 1981, Otis B. Chase III bought a house and barn (the "property") in Sanbornville, New Hampshire. To finance the purchase, Chase obtained a loan that was secured by a mortgage on the property and guaranteed by the VA. Soon after the purchase, the mortgage company that had issued the loan to Chase assigned its mortgage to First Family Mortgage Corporation ("FFMC").

2. On March 19, 1981, Chase obtained a homeowner's insurance policy from LMC, through its agent, Ossipee. The policy named FFMC as mortgagee.

3. Chase renewed the policy in each of the next two years, making the fully paid policy's termination date March 19, 1984.

4. In April 1983, after Chase defaulted on his mortgage payments, the Manchester, New Hampshire VA office sent a letter to FFMC granting FFMC permission to foreclose on the property. The letter instructed FFMC (1) not to cancel any hazard insurance on the property and (2) if any such policy existed, to "obtain endorsements naming the Administrator of Veterans Affairs (c/o Director of this VA office) as an assured, as the Administrator's interest may appear." These instructions comported with VA Regulations. *See* 38 CFR 36.4320(H)(2).

5. On May 5, 1983, following an unsuccessful foreclosure sale, FFMC notified the

VA that it intended to convey ownership of the property to the VA as guarantor of the loan. However, before FFMC could make such a conveyance (and collect on the guarantee), FFMC was required, among other things, to obtain an endorsement to the VA of Chase's policy with LMC pursuant to 38 CFR 36.4320(H)(2).

6. On May 19, 1983, in an apparent attempt to comply with the VA's endorsement requirement, FFMC sent the following letter to Ossipee, as agent for LMC:

This letter is in regards [sic] to the hazard insurance policy on the above captioned loan.

Please be advised in the future all correspondence is to be forwarded to the VA address below.

We also request that you remove First Family Mortgage Corporation from the Mortgagee clause and change the owner to the Administrator of Veterans Affairs. If there is a refund due to cancellation of the above referenced policy, the check should be made payable to the Administrator of Veterans Affairs, at the address below.

If you have any further questions, please contact our office.

At the bottom of the letter, FFMC erroneously listed the address of the VA's Newark, New Jersey office, which had no involvement with the Chase guarantee, rather than that of the VA's Manchester, New Hampshire office, which was responsible for handling the matter.

7. The Manchester VA office received a copy of FFMC's above letter to Ossipee. Relying on that letter as adequate proof that the policy was being endorsed to it, the VA paid FFMC $48,570.90 to fulfill its loan guarantee.[1]

8. On May 23, 1983, Robert Brown, the Ossipee agent in charge of the policy, received FFMC's May 19, 1983 letter. Brown professed confusion as to what the letter requested. He did little to eliminate this confusion, however. Rather than calling FFMC, Chase, or the VA's office in Man-

---

1. Even though the May 19 letter did not constitute an endorsement (and thus did not fulfill the literal requirements of 38 CFR 36.4320(H)(2)) a

representative of the VA testified that it was the VA's regular practice to rely on such letters rather than waiting for an endorsement.

chester (or New Jersey) Brown contacted a VA management broker in the local area, Janet Mason, who told him that she did not know anything about the letter. She never got back to him, and he did nothing further.[2] FFMC thus remained as the mortgagee on the policy, and Chase remained as the owner, even though the VA now owned the property.

9. On January 9, 1984, Brown made an official visit to the property, finding the premises vacant. That same day, he wrote a letter to Chase, the named owner of the property. The letter stated that Brown "was by there the other day and it did not appear that anyone was there. Will you let me know what we should be doing with this."

10. Two days later, Chase informed Brown that he no longer owned the property and that the VA had owned the property since November 1983.

11. Brown then contacted LMC (the insurer) and recommended that LMC cancel the policy because the VA owned the property and Chase no longer lived there.

12. On January 23, 1984, LMC sent cancellation notices to FFMC and to the VA office *in New Jersey.* The notices stated that "[t]he property is unoccupied. Homeowners Insurance is only for occupied homes. There are other kinds of insurance for vacant property."[3] The cancellation was to take effect at noon on March 12, 1984, one week before the policy's termination date.

13. While working at the property on the morning of March 12, 1984 (the date of the policy's cancellation), John Couch, a local plumber, inadvertently started a fire that eventually destroyed the entire premises.

14. A few days later, the Manchester VA office finally received LMC's cancella-

tion notice, which the New Jersey VA office had forwarded.

15. The VA then attempted to collect on the policy, but LMC refused coverage on the (erroneous) ground that the fire had occurred *after* the policy had been cancelled. In fact (the district court found) the fire had occurred a few hours *before* the policy had been cancelled.

16. On March 12, 1985, the United States brought this suit in federal court against LMC, seeking coverage under the insurance policy for its losses due to the fire on the premises. In addition to defending on the merits, LMC responded with third-party actions against John Couch, the plumber who started the fire, and Ossipee, LMC's agent.

17. In an order dated September 4, 1985, the district court refused to grant summary judgment against the VA, stating that the following disputed issue of fact existed: "whether VA was reasonably entitled to rely on compliance with the [May 19, 1983] request of First Family that VA be named as owner and the policy thus assigned to it." It also denied Ossipee's motion to dismiss LMC's third-party claim against it.

18. Following some discovery, LMC again filed a motion for summary judgment, which Ossipee joined.[4] The district court denied the motion on September 11, 1986.

19. On September 18, 1989, following a bench trial, the district court rejected the VA's estoppel argument, on the ground that it was the VA's fault that it had received the cancellation notice after the fire destroyed the premises. The court then found, *sua sponte,* that the policy should be reformed so that the VA would be substituted as owner and thus allowed to recover under the policy against LMC. The court further held Ossipee and Couch joint-

---

**2.** Brown's contemporaneous note of the conversation states that "Janet will let us know when VA takes over and pol[icy] no longer needed."

**3.** This initial reason for cancellation—that the property was unoccupied—contradicted an express provision of the policy, which allowed

"the premises to be vacant or unoccupied without limit of time."

**4.** As a third-party defendant, Ossipee was entitled to "assert against the plaintiff [the VA] any defenses which the third-party plaintiff [LMC] has to the plaintiff's claim." Fed.R.Civ.P. 14.

ly and severally liable to LMC on its third-party claims, because Brown (the Ossipee representative) had failed to act with due diligence in responding to the letter from FFMC, and because Couch (the plumber) had started the fire.

■ 20. Ossipee alone appealed, arguing that LMC's third-party judgment against it should be reversed because (1) the district court erred in ordering the policy reformed to substitute the VA as owner[5], and (2) even if reformation were proper, wrongful conduct by Ossipee was not the cause of LMC's liability to the VA under the policy. In response, (1) the VA argues that the district court committed no error with regard to the judgment against LMC, and (2) LMC argues that the court committed no error with regard to the judgment against Ossipee.[6] Neither LMC nor Couch has appealed.

## II. REFORMATION OF THE CONTRACT

New Hampshire courts have established two alternative tests for determining whether a party is entitled to reformation of a contract. Under the first test, a court reforms a contract if the party demonstrates clear and convincing evidence of "(1) an actual agreement between the parties, (2) an agreement to put the agreement into writing; and (3) a variation between the prior agreement and the writing." *Demetracopoulos v. Strafford Guidance Center*, 130 N.H. 209, 536 A.2d 189, 191 (1987). *See also Midway Excavators, Inc. v. Chandler, Comm'r*, 128 N.H. 654, 522 A.2d 982, 984 (1986). In the present case, all parties essentially agree that this test has no relevance, because no "actual agreement" existed between the VA and LMC (or Ossipee).

■ Under the second test, a court orders reformation if a party establishes clear and convincing evidence of a contract's failure to reflect the parties' true intent due to *mutual mistake*. *See Midway Excavators, Inc.*, 522 A.2d at 984; *Grabowski v. Grabowski*, 120 N.H. 745, 422 A.2d 1040, 1042 (1980). The district court apparently relied on this "mutual mistake" test in ordering the policy reformed to name the VA as the insured owner of the property. Finding that Ossipee agent Brown had failed to exercise reasonable diligence in responding to the

---

**5.** While Ossipee, a third-party defendant, was not a party to the United States' main action on the policy against LMC, it may raise on appeal claims of error based in the main action, as well as claims of error relating strictly to the third party proceeding. This principle stems from the fact that Ossipee's third-party liability to LMC is entirely derivative of the VA's judgement against LMC, and will cease to exist if that judgment is defeated. *See, e.g., Kicklighter v. Nails by Jannee, Inc.*, 616 F.2d 734, 738 n. 1 (5th Cir.1980) ("Rule 14, Fed.R.Civ.P. provides that a 'third-party defendant may assert against the plaintiff any defenses which the third-party plaintiff has to the plaintiff's claim.' From this provision, we think it logically follows that the third-party defendant may assert on appeal errors in the main case."). *See generally* 3 J. Moore, *Moore's Federal Practice* ¶ 14.19 at 14–105 (2d ed. 1990) (similar). We note, however, that although Ossipee is asserting errors in the main case, we do not view its appeal as being from the main judgment *per se*. Rather, we view the appeal as being from the judgment entered against *it*, on the ground (*inter alia*) that the main judgment was erroneous. Whether LMC, which did not appeal, will also benefit from Ossipee's perfected appeal is discussed in section IV, *infra*.

**6.** In addition to defending the district court's ruling on third-party liability, LMC—without appealing—has attempted to argue that we should *reverse the United States' (i.e., the VA's) judgment against it*. As an appellee, LMC is not permitted to urge a reversal of that judgment. *See Massachusetts Mut. Life Ins. Co. v. Ludwig*, 426 U.S. 479, 480–81, 96 S.Ct. 2158, 2159, 48 L.Ed.2d 784 (1975) (per curiam) (" '[T]he appellee may not attack the decree with a view either to enlarging his own rights thereunder or *lessening the rights of his adversary*, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below.' ") (emphasis added) (quoting *United States v. American Ry. Exp. Co.*, 265 U.S. 425, 435, 44 S.Ct. 560, 563, 68 L.Ed. 1087 (1924)). *See generally* 9 J. Moore, B. Ward, J. Lucas, *Moore's Federal Practice* ¶ 204.11[3] at 4–48 (2d ed. 1990) ("If a defense to a claim is offered and rejected and the claim is allowed in whole or in part, the allowance of the claim cannot be attacked by the appellee unless he has filed a notice of appeal."). We thus grant the VA's motion to strike LMC's argument for reversal.

May 19 letter from FFMC, the district court ruled that:

> [t]he clear and convincing evidence here presented warrants reformation of the policy to substitute VA for Chase as the insured and to award a payment thereunder to the plaintiff, as VA clearly possessed an insurable interest in the premises as of the time of the fire. *Bergeron v. Fontaine* [109 N.H. 370, 256 A.2d 656 (1969)],.... Were the Court to sustain the position of LMC, no one would be entitled to recover under a policy for which premiums had been made and fully retained. Such result would be unconscionable. *Johnson v. Phenix Mutual Fire Ins. Co.* [122 N.H. 389, 445 A.2d 1097 (1982)],....

While the district court's conclusion is not without rough justice, we must reluctantly reject it, as it was "predicated on or induced by, a misapprehension of law." *Gel Systems Inc. v. Hyundai Engineering & Construction Co., Inc.*, 902 F.2d 1024, 1027 (1st Cir.1990) (quoting *RCI Northeast Services Division v. Boston Edison Co.*, 822 F.2d 199, 203 (1st Cir.1987)). There was simply no mutual mistake here, as that term has been defined in New Hampshire law.

The pivotal New Hampshire reformation case—and the one on which the district court relied—is *Bergeron v. Fontaine*, 109 N.H. 370, 373, 256 A.2d 656, 659 (1969).[7] In *Bergeron*, plaintiff Bergeron (1) sold Fontaine his clothing business, accepting a note from Fontaine for the purchase price, and (2) leased Fontaine the premises in which the clothing store was located. Although the parties decided against a mortgage, they agreed that Bergeron would have the right to repossess the merchandise upon Fontaine's default. As further security, the written lease provided that Fontaine, the lessee, would keep the "merchandise in the store insured for an amount not less than the balance the lessee [Fontaine] owes the lessor [Bergeron] and said policy shall be made payable to the lessor

as his interest may appear." *Bergeron*, 256 A.2d at 658.

Pursuant to this lease provision, Bergeron and Fontaine met with an insurance agent, told him of their agreement, and instructed him to ensure that Bergeron was "named in the policies to the total amount of the obligation." *Id.* The insurance agent then drew up the policy, *under the mistaken assumption that Bergeron was a mortgagee, rather than a payee.*

A fire subsequently destroyed the property, and Bergeron brought a petition in equity to reform the insurance policies so that he would be listed as a "payee" instead of a "mortgagee." The trial court ordered the policies reformed on the ground of mutual mistake, and the Supreme Court of New Hampshire affirmed, stating that "Bergeron and Fontaine 'clearly intended to secure insurance so as to provide full coverage for the indebtedness ... for the benefit of the plaintiff without reservation' and that this was made known to [the insurance agent] and he by mistake inserted plaintiff's name in the 'mortgage clause.'" *Id.*

*Bergeron* does not support a finding of mutual mistake here. In *Bergeron*, the mistake was *mutual:* (1) the insureds (Bergeron and Fontaine) after meeting with the acquiescent agent, reasonably assumed that they had secured adequate protection under the policy for Bergeron, *see id.* 256 A.2d at 658. ("Since plaintiff's name did appear on all the policies, the plaintiff and Fontaine ... could reasonably assume that plaintiff's interest was covered in accordance with their agreement."); and (2) the insurance agent intended to comply with the parties' wishes, took steps to change the policy, and *mistakenly* believed these changes were correct, *see id.* (agent "innocently but by mistake undertook to put plaintiff's name in the 'Mortgage Clause'"). Here, however, while FFMC and the VA may have given proper instructions and thereafter assumed that they had secured adequate protection for the VA,

---

7. *Johnson v. Phenix Mut. Fire Ins. Co.*, 122 N.H. 389, 445 A.2d 1097 (1982), the other case cited by the district court, is not a reformation case,

but rather a case applying the doctrine of estoppel. The court properly rejected estoppel here. *See* section III, *infra.*

the insurer's agent Brown never took affirmative, albeit mistaken, steps to conform the policy to their instructions. To the contrary, Brown took no action whatever to secure adequate protection for the VA. Whether he and his principal, LMC (had it been advised) would have inserted the VA as owner rather than cancelling is unclear. This is not a case where it can be found that the agent, meaning to comply with instructions, took actions to make the policy conform to the instructions, but erred in the contractual expression of that intent. Accordingly, there could be no mutual mistake under New Hampshire law.

Were we to construe *Bergeron* to cover the facts of the instant case, we would be holding that a New Hampshire plaintiff can secure reformation of an insurance policy if he establishes that (a) he instructed an insurance agent to make a change in a policy; and (b) the insurance agent, *without agreeing to make the change*, failed to take any action in response to the request. We are confident that the New Hampshire Supreme Court would not extend *Bergeron* so far, and must, therefore, decline to do so ourselves. Since no mutual mistake existed—and without any right to recover on estoppel grounds, *see* section III, *infra*—the VA cannot recover on the policy. *Cf., e.g., Gagnon v. Pronovost,* 97 N.H. 58, 80 A.2d 381, 385 (1951) (rejecting reformation where evidence "fails to clearly indicate that *each grantee* intended survivorship, rather than a tenancy in common with interests proportional to the investment of each") (emphasis added). That the district court thought a contrary result "unconscionable" will not sustain the court's ruling. *See Midway Excavators,* 522 A.2d at 984 (even where plaintiff "maintains that reformation will prevent an unconscionable

loss to the plaintiff and a windfall to the State ..., in the case of *unilateral* mistake the remedy is recision, not reformation") (emphasis added).[8]

### III. ESTOPPEL

In New Hampshire, "[e]stoppel involves a *reasonable* reliance upon the act, conduct, or non-action of another." *Margolis v. Saint Paul Fire & Marine Ins. Co.,* 100 N.H. 303, 125 A.2d 768, 772 (1956) (emphasis added). *See also Johnson v. Phenix Mutual Fire Ins. Co.,* 122 N.H. 389, 393, 445 A.2d 1097, 1099 (1982). The determination of whether a party has established reasonable reliance "rests on the facts and circumstances of each case." *Concrete Constructors v. Harry Shapiro & Sons,* 121 N.H. 888, 436 A.2d 77, 80 (1981). *See also Olszak v. Peerless Ins. Co.,* 119 N.H. 686, 406 A.2d 711, 714 (1979) ("The burden of proving estoppel is upon the party asserting it, and its existence is a question of fact to be resolved by the trier of fact, who may reject or accept such portion of the testimony as it chooses.").

■ In the present case, the district court determined that the key disputed issue of fact relative to estoppel was whether the VA was reasonably entitled to rely on Brown's anticipated compliance with the May 19, 1983 request of FFMC that the VA be named as owner and the policy be assigned to the VA. The district court found in the negative, a finding we sustain as not clearly erroneous.

In its estoppel analysis, the district court assumed, for the sake of argument, that the "VA was reasonably entitled to initially rely on the letter of May 19, 1983...." That assumption is itself questionable,[9] but

---

8. We do not address the appropriateness of the remedy of recision, as it was not raised by the VA below or on appeal.

9. As the VA was not previously listed on the insurance policy as a party or a mortgagee, its right to claim an estoppel based on Brown's failure to follow FFMC's instructions is doubtful. *See generally* 18 R. Anderson, *Couch on Insurance 2d* § 71:10 at 224 (1983) ("Only the parties to the contract of insurance, or their privies, can claim the benefit of a waiver or an

estoppel."); 16B J.A. Appleman and J. Appleman, *Insurance Law* § 9090 (1981) ("Insurance contracts cannot be created by estoppel. That doctrine cannot be invoked ... to create a primary liability of the insurer for which all elements of a binding contract are necessary."). *Cf. Bergeron v. Fontaine,* 109 N.H. 370, 256 A.2d 656, 659 (1969) (allowing recovery where the "appearance of *plaintiff's name on the policy* gives clear indication that it was intended that some interest of his in the property was to be insured.") (emphasis added).

having made it, the court went on to find, supportably, that the VA "could not maintain such reliance following issuance of the cancellation notice, for it was FFMC, who had a relation with VA and not with LMC, that caused the mail to be addressed to the wrong branch office of VA." In so holding, the court implicitly found that the VA's reliance was unreasonable because it should have known prior to the fire that agent Brown had not followed the instructions in FFMC's letter. *Cf. City of Concord v. Tompkins*, 124 N.H. 463, 471 A.2d 1152, 1154 (1984) (A party's reliance is unreasonable "when the party asserting estoppel, at the time of his or her reliance or at the time of the representation or concealment, knew or should have known that the conduct or representation was either improper, materially incorrect or misleading.").

■ On appeal, the VA in effect argues that the district court's finding in this regard was clearly erroneous and that we should hold as a matter of law that the VA reasonably relied on FFMC's May 19 letter.[10] The VA presents three arguments. First, because the fire occurred *after* the cancellation notice went into effect, the notice was irrelevant to the issue of coverage (and thus irrelevant to the issue of reasonable reliance). Second, even if the notice were relevant, the district court was clearly erroneous in finding (implicitly) that in response to the notice the VA would have taken some action to clarify the situation. According to the VA, because the notice listed the VA as a "mortgagee or other interest," the VA "reasonably would have been assured that it was protected under the policy" and it thus would have been reasonable for the VA to have done nothing in response to the cancellation notice. Third, that the policy was near the end of

the term, and that the VA is a self-insurer, support a finding that the VA reasonably would have had no need to contact LMC regarding the cancellation notice.

Despite these arguments, we cannot say the court's contrary position was clearly erroneous. *Cf., e.g., Irons v. FBI*, 811 F.2d 681, 684 (1st Cir.1987) ("where the conclusions of the [trier] depend on its election among conflicting facts or its choice of which competing inferences to draw from undisputed basic facts, appellate courts should defer to such fact-intensive findings, absent clear error"). The district court could reasonably infer that, as a factual matter, the cancellation notice would have induced the VA to take some action to clarify the confusion surrounding the policy. The facts that (1) the VA was listed in the cancellation notice as only a "mortgagee or other interest," and (2) Otis Chase (rather than the VA) was still listed as the "named insured," support such a finding. Had the VA seen these errors, it would have known that its assumption regarding agent Brown's conduct (that he followed FFMC's instructions) was "materially incorrect." *Tompkins*, 471 A.2d at 1154, and, consequently, it might have contacted LMC to resolve the issue. We hold that the district court's finding on this matter was "free from observable legal error." *Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 393 (1st Cir.1990). We accordingly sustain its rejection of the estoppel theory for allowing the VA to recover under the policy.

## IV. DISPOSITION

■ Because New Hampshire law does not support the district court's reformation order, and because the district court properly rejected the VA's estoppel argument, the VA was without legal right to recover

---

**10.** As appellee, the United States may present any alternative ground for affirming the district court's judgment, so long as it appears in the record. *See Massachusetts Mut. Life Ins. Co. v. Ludwig*, 426 U.S. 479, 481, 96 S.Ct. 2158, 2159, 48 L.Ed.2d 784 (1975) (per curiam) (stating settled rule "that the appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the rea-

soning of the lower court") (quoting *United States v. American Ry. Exp. Co.*, 265 U.S. 425, 435, 44 S.Ct. 560, 563, 68 L.Ed. 1087 (1924)). *See generally* J. Moore, B. Ward, J. Lucas, *Moore's Federal Practice* ¶ 204.11[3] (2d ed. 1990) (appellee "may defend the judgment in his favor with any argument that is supported by the record, whether it is ignored by the district court or *flatly rejected*") (emphasis added).

under the policy and hence to impose liability upon LMC. It follows that the district court's third-party judgment allowing LMC, as third-party plaintiff, to recover against Ossipee, must be reversed. That judgment was necessarily premised on two components: (1) that the VA had a right to recover from LMC under the policy, and (2) that LMC, as third-party plaintiff, had a right in turn to indemnification from Ossipee. Since the first component fails, the third-party judgment against Ossipee must be reversed.[11]

■ This leaves something of a conundrum as to the status of the remaining parties, especially LMC. While, as Ossipee has successfully urged, the VA had no legal right to recover from LMC, the latter did not appeal. Without a timely appeal, the district court's judgment against it became final. *See Marin Piazza v. Aponte Roque*, 909 F.2d 35, 39 (1st Cir.1990) ("[T]he inescapable consequence of failure to appeal a judgment within the time allowed is that the judgment becomes final."). LMC's failure to cross-appeal makes it inappropriate for us to modify the judgment against it notwithstanding the fact that the judgment was based on a legal error. *See PNH Corp. v. Hullquist Corp.*, 843 F.2d 586, 595 (1st Cir.1988) ("Because [defendant] did not appeal the district court's dismissal of [his] crossclaim against the [other] defendants, we do not address that portion of the judgment.").

In reversing only the third-party judgment against Ossipee, thus leaving intact the main judgment against LMC, we need not decide whether Fed.R.App.P. 4(a)(3)'s 14–day requirement for filing a cross-appeal is a "rule of practice" (which can be waived) or, rather, a "mandatory, jurisdictional requirement" (which can never be waived). *See Young Radiator Co. v. Celotex Corp.*, 881 F.2d 1408, 1415–17 (7th Cir. 1989) (citing split in circuits, holding that *Torres v. Oakland Scavenger Co.*, 487 U.S.

312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988) "made clear that the requirements of Rules 3 and 4 must be satisfied as to each party, and precludes the argument that noncompliance with Rule 4(a)(3) can be waived"). Even were we to adopt the more lenient "rule of practice" approach toward Rule 4(a)(3), *see generally* 9 J. Moore, B. Ward, J. Lucas, *Moore's Federal Practice* ¶ 204.11[5] (2d ed. 1990) (urging rule of practice approach); 15 C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure*, § 3904 at 417–19 (1976) (same), we would not be persuaded that the interests of justice in this particular case necessitate a reversal of the VA's judgment against LMC. *Cf. id.* at 418 (power to modify judgment against non-appealing party should be used only to "provide justice in particularly worthy cases").

To be sure, precedent exists in support of relief for a non-appealing defendant in LMC's position. In *Kicklighter v. Nails by Jannee, Inc.*, 616 F.2d 734, the Fifth Circuit held that, where a third-party defendant's liability is derivative of the defendant's liability to plaintiff, the vacating of the judgment against the third-party defendant based on error in the main case requires vacating the judgment against the main defendant as well, even though that defendant did not appeal. *Kicklighter* differed from the present case in one respect, however: the main case error (an erroneous jury charge) called not for outright reversal but only for a new trial. Thus, as we shall discuss, *Kicklighter* presented a more compelling case than does the present for reopening the judgment against the non-appealing main defendant.

The *Kicklighter* court presented three reasons in support of its holding. First, it would "violate common sense and common notions of justice" to limit relief to the third-party defendant because "[t]he appellate process has been fully invoked and utilized" and "[e]rror has been found in the

---

**11.** LMC's claim against Ossipee was premised on the theory that Ossipee had violated its duty as agent to LMC, and caused LMC to suffer a loss to the VA, "by failing to warn Lumbermens in a timely fashion of the increased risk represented by the vacancy of the Chase property."

On appeal, Ossipee separately attacks the court's finding of third-party liability (the second component). However, we need not consider Ossipee's claim of error in view of our holding that LMC suffered no actionable loss.

judgments against both the defendant and the third-party defendant." *Id.* at 744. This reasoning, however, conflicts with our recent holding in *Marin Piazza v. Aponte Roque,* 909 F.2d 35, 39, where we ruled that the plaintiffs *who did not appeal* could not benefit from a reversal of the judgment against the plaintiffs who did appeal, even though the appellate process had been "fully invoked and utilized" and error had been found in the judgments against all the plaintiffs. Our strict view in *Marin Piazza* rested in part on the Supreme Court's recent strictness in *Torres v. Oakland Scavenger Co.,* 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988). *See also Federated Department Stores, Inc. v. Moitie,* 452 U.S. 394, 399 n. 4, 101 S.Ct. 2424, 2428 n. 4, 69 L.Ed.2d 103 (1980) (noting "generally accepted rule in civil cases that where less than all of the several co-parties appeal from an adverse judgment, a reversal as to the parties appealing does not necessitate or justify a reversal as to the parties not appealing") (quoting *National Association of Broadcasters v. FCC,* 554 F.2d 1118, 1124 (D.C.Cir.1976)).[12]

The *Kicklighter* court's second reason for extending relief to the non-appealing defendant was to prevent the "anomalous result" in which "defendant is ultimately liable, and third-party defendant is not, even though there is an error-free judgment that third-party defendant should be responsible for whatever liability defendant incurs." *Kicklighter,* 616 F.2d at 744. In this case, of course, we have not reached the issue of whether, apart from the error in the main case, the judgment against Ossipee was "error-free." LMC, moreover, could have avoided any "anomalous result" by appealing from the judgment entered against it. LMC certainly could have foreseen that Ossipee might win its appeal, leaving LMC with only Couch to turn to for

indemnification. *Cf. Moore's Federal Practice* ¶ 204.11[5] at 4–59 n. 18 ("When relief is granted and one defendant appeals and the other does not, the non-appealing party leaves himself open to immediate enforcement of the judgment and normally cannot rely upon the outcome of the appeal.").

The third reason given in *Kicklighter* was that, absent a reversal as to the defendant, the "third-party defendant would probably get off scot-free, although the error which third-party defendant has successfully asserted would ordinarily entitle it only to a *new trial.*" *Kicklighter,* 616 F.2d at 744 (emphasis added). This reason offers strong support for the result reached in *Kicklighter* where an instructional error in the main case required a new trial, not, as here, reversal. Had the new trial resulted in a plaintiff's verdict, the third-party defendant would again have to respond in damages to the defendant/third-party plaintiff. Here, however, the error in the main case was such as to conclude the proceeding. Ossipee's right to secure a final favorable judgment on the third-party claim against it is unconditional. In order to provide appropriate relief to Ossipee, there is no need to reopen the main case.[13] While LMC is left subject to a liability it could have avoided had it appealed, its plight is no worse than that of any other party who neglects to file a timely appeal.

Accordingly, even were we to follow the rule of practice approach, we would nevertheless decline to disrupt the judgment against LMC. By not appealing, LMC assumed the risk that the present situation might arise. LMC implicitly acknowledges as much in characterizing its (now stricken[14]) argument for reversal as "*not* an independent attempt by Lumbermens to im-

---

**12.** One could try to distinguish *Marin Piazza* from the instant case by arguing that here, unlike in *Marin Piazza,* the appealing party (Ossipee) has a direct interest in the fate of the judgment against the non-appealing party (LMC). That is, in order to secure relief for itself the appealing party *must* secure relief for the non-appealing party. However, given that Ossipee has standing (1) to appeal the judgment

against *it* and (2) in so doing, to raise errors in the main case, *see* note 5, *supra,* we need not reopen the judgment against LMC in order to grant relief to Ossipee. Thus, *Marin Piazza* is not distinguishable on that basis.

**13.** *See* note 12, *supra.*

**14.** See note 6, *supra.*

prove upon its successful position as found in the United States District Court." (emphasis added). In these circumstances, reversing the judgment against LMC would not serve the interests of justice, especially when one considers the possible adverse incentive effects a contrary holding might produce.[15]

*The judgment against Ossipee (alone) is therefore reversed. Costs are awarded to Ossipee solely against the United States.*

---

**15.** Because Couch, the other third-party defendant, did not appeal, we also decline to upset LMC's third-party judgment against it. *See Marin Piazza,* 909 F.2d at 39.