USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-2318 PATRICIA JOHNSON, ET AL., Plaintiffs, Appellees, v. TEAMSTERS LOCAL 559, ET AL., Defendants, Appellants. ____________________ No. 95-2319 PATRICIA JOHNSON, ET AL., Plaintiffs, Appellants, v. TEAMSTERS LOCAL 559, ET AL., Defendants, Appellees. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Frank H. Freedman, U.S. Senior District Judge] __________________________ ____________________ Before Selya, Circuit Judge, _____________ Campbell, Senior Circuit Judge,  ____________________ and Boudin, Circuit Judge. _____________ ____________________ Daniel B. Edelman, with whom Yablonski, Both & Edelman and Burton _________________ _________________________ ______ S. Rosenberg were on brief, for Teamsters Local 559, et al. ____________ Terrence A. Low, with whom Rosen, Greenhut, Catuogno & Low and _______________ _______________________________ Patricia Bobba Donovan were on brief, for Patricia Johnson, et al. ______________________ ____________________ December 13, 1996 ____________________ CAMPBELL, Senior Circuit Judge. In the principal _____________________ appeal now before us, Teamsters Local 559 and Robert Dubian appeal from state law tort judgments against them arising out of a workplace conflict. They argue, inter alia, that there is insufficient evidence to support the judgments under the Norris-LaGuardia Act's "clear proof" requirement. I.  I.  Frank Johnson worked at Sweet Life Foods ("the Company" or "Sweet Life") in Suffield, Connecticut and was a member of Teamsters Local 559 ("the Union"). He sued the Union and two of its officers, Robert Dubian and Tom Gilmartin, Jr., alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., and asserting _______ pendent state law claims for intentional infliction of emotional distress and assault. Patricia Johnson, Frank Johnson's wife, sued for loss of consortium.  The district court, in a bench trial, found for all three defendants on Johnson's Title VII claims. Johnson did not appeal from this determination. The pendent state law claims were tried to a jury which returned verdicts against the Union, Dubian and Gilmartin for intentional infliction of emotional distress and loss of consortium. The jury also returned a verdict against the Union, but not against Dubian or Gilmartin, for assault. The jury assessed damages against the Union of -2- 2 $120,000 for intentional infliction of emotional distress, $35,000 for loss of consortium, and $105,000 for assault. The jury found Dubian liable for $35,000 on the intentional infliction claim and $35,000 on the loss of consortium claim. Gilmartin was found liable for $40,000 on the intentional infliction claim and for an additional $40,000 on the loss of consortium claim. Responding to the defendants' Rule 50(b) motion, the district court entered judgment as a matter of law for Gilmartin, ruling that no reasonable jury could have found him liable for intentional infliction of emotional distress and loss of consortium. However, the court let stand the jury's verdicts against the Union and Dubian. The latter now appeal from the judgments against them, and the Johnsons cross-appeal from the court's entry of judgment as a matter of law in Gilmartin's favor.  II. II. We recite the facts as they might reasonably have been found by the jury. Sweet Life, a food distributor, suspected that it was losing significant amounts of meat to employee theft, and so it placed secret cameras in the work area to discover who was responsible. From what was uncovered, it appeared that over ten employees were involved in the thefts, which had gone on for four or five years and were common knowledge among the employees, all of whom were -3- 3 also Union members. Several employees were caught stealing on tape and were fired. One of the tapes showed Johnson opening up a crate of meat, although it did not reveal him in the act of actually stealing meat. The Company confronted Johnson with the tape and threatened that he would be fired if he did not reveal the names of other employees responsible for the thefts. The Union had a written policy against harming a Union brother. Both Union officials and members interpreted this policy as prohibiting one member from "ratting" on another. Dawn Mitchell, the acting Union steward, told Johnson he should allow himself to be terminated rather than reveal the names of the employees who were stealing because of this Union policy against turning in a Union brother. Gilmartin also told Johnson about this policy. Dennis Kawa, a Sweet Life worker and Union witness, stated that he did not report any of the many incidents of stealing he saw by various Union members because "[i]t's a rule" not to turn in a Union brother. Johnson ignored Mitchell's advice and provided the company with the names of three men he said he had seen stealing. The Company fired these men entirely on the basis of Johnson's information. The three fired men filed a grievance with the Union, and an arbitration hearing was set for April 29, 1986. -4- 4 Starting before and intensifying after the arbitration hearing, unidentified employees of Sweet Life, who were also Union members, began harassing Johnson. They wrote threatening messages on the bathroom walls such as, "Frank, where will you be when the lights go out?"; "559 Rule"; "There's only one thing worse than a rat--a nigger rat"; "The rat will never work again when we get through with him, nowhere"; "Frank Johnson is as good as dead, 4/29/86"; "Bye bye Frank. Look for another job."; "Who didn't pass spear chucking school?"; "559 rules Frank Johnson"; "Call me" (with Johnson's phone number); and "Frank Johnson's a squealing nigger rat." The walls were painted several times, but the graffiti persisted. These anonymous Union members also made rat and pig noises when around Johnson; put pieces of wood in the keyhole of Johnson's forklift; placed buckets of water on the top of Johnson's forklift; sang "slave songs" such as "Swing Low Sweet Chariot" at him during every hourly break, every day; drew pictures of rats on Johnson's locker and on the walls; threw peanut shells and a milk carton at him; hung a rubber chicken on his forklift; and ostracized him socially. This harassment involved a large number of employees all of whom, as said, were Union members and only intensified as time went on.  -5- 5 At the arbitration hearing, Gilmartin, the Union Business Agent and the officer primarily responsible for enforcing the Union's collective bargaining agreement with the Company, defended the three accused employees and convinced the arbitration panel to reinstate them and award them back pay. He accomplished this primarily by casting doubt on Johnson's testimony and accusing him of stealing meat. Gilmartin charged that the tape shown at the hearing portraying Johnson opening a crate of meat had been edited; the original tape, he said, had also shown Johnson actually putting meat into his pocket. Gilmartin and the Union were at all relevant times aware of the harassment of Johnson. Gilmartin held two meetings with the Union members. At the first meeting, before the arbitration hearing, Gilmartin stated that he would personally "take care of" anyone who harmed a Union brother. Either at that meeting or at the other, Gilmartin stated that he disagreed with people's writing on the walls and that anyone actually caught doing so would be fired. He indicated that he opposed the racial epithets and that they were offensive to the other African-American members. Sweet Life provided Johnson with guards to escort him to and from work and to watch over his home. For security reasons, Johnson left work a few minutes early each day. The Company wanted to pay him as if he were not missing -6- 6 this time, but Gilmartin opposed paying Johnson without an agreement from Sweet Life to pay all people who left early under extraordinary circumstances. When the Company went ahead and paid Johnson anyway, Gilmartin filed a grievance. As a result of the harassment, Johnson suffered from Post-Traumatic Stress Disorder for which he sought psychiatric treatment. He became paranoid and was unable to sleep or interact normally with his wife and family. He became increasingly depressed and began drinking regularly. His psychiatrist placed him on antidepressant and antianxiety medication. On August 12, 1986, Johnson left Sweet Life because of his psychiatric condition. After Johnson's departure, Dubian, the Union's Secretary-Treasurer, drove by Johnson's home in a Union-owned car several times a day for a period of some three weeks. Dubian testified that the purpose of these visits was to determine if Johnson had found new employment. The three fired employees had filed charges against Johnson for breaking the Union's rule against harming a Union brother. If Johnson were working elsewhere, he would no longer be subject to the Union's authority, and Dubian could dismiss the charges. On appeal, Dubian argues that there was insufficient evidence in the record to support the jury's -7- 7 judgment against him for intentional infliction of emotional distress.  The Union contends that because the underlying arbitration hearing involved a labor dispute, the Johnsons' claims are governed by the Norris-LaGuardia Act's "clear proof" requirement.1 The Union believes that under this, more rigorous, standard, there is insufficient evidence to support the judgments against it for intentional infliction of emotional distress and for assault. Even if there is sufficient evidence, the Union contends that the fact that the special verdict form did not mention the "clear proof" requirement necessitates a new trial. In their cross-appeal, the Johnsons argue that the court erred in entering judgment as a matter of law for Gilmartin on the intentional infliction of emotional distress and loss of consortium claims because there was sufficient evidence to validate the jury's finding. III. III. A. Dubian's Liability __________________ Dubian argues that his conduct in driving by the Johnsons' home and following Johnson when he left his house for a period of three weeks was not the sort of "extreme and outrageous" behavior that can justify a judgment for  ____________________ 1. 29 U.S.C. 106. -8- 8 intentional infliction of emotional distress under Connecticut law. See Petyan v. Ellis, 510 A.2d 1337, 1342 ___ ______ _____ (Conn. 1986). He also argues that the jury could not reasonably have concluded that he intended to cause Johnson distress or that he succeeded in doing so. We disagree. Dubian plainly knew that Johnson had just resigned from Sweet Life after working in a viciously hostile work environment in which he was subjected to daily threats and insults. As a Union officer closely associated with these events, Dubian could be inferred to have known of the extent of the abuse imposed upon Johnson and of its emotional and psychological impact, resulting in his departure from the Company. Given Johnson's recent history, the jury could have found that Dubian's conduct in driving by Johnson's house in a Union car several times a day for three weeks, and following Johnson, was intentional harassment that met the "extreme and outrageous" standard. This case is different from Thorpe v. Mutual of ______ _________ Omaha Ins. Co., 984 F.2d 541, 545-46 (1st Cir. 1993), in _______________ which we held that an insurance company's surveillance aimed at determining the activities of an insured who claimed to have become totally disabled did not constitute extreme and outrageous conduct. The insurance company's proffered reasons for the surveillance were plausible and legitimate in the circumstances. Dubian's stated reason for driving by -9- 9 Johnson's house over thirty times in three weeks was that he wished to determine whether Johnson was working so that he could drop Union charges made against Johnson by the three fired employees. A reasonable jury could have found that this explanation was at best flimsy and at worst absurd. Conduct which might be acceptable when done for a legitimate reason can be extreme and outrageous if unjustifiably performed simply to inflict harm.  The jury could easily have rejected Dubian's tendered justification as lacking in plausibility, and could reasonably have found that his true intent in driving by the Johnson home was to harass and cause distress to Johnson. There was also evidence from which the jury could have concluded that Dubian's surveillance contributed to causing Johnson's psychological injury. Johnson's psychiatrist, George Milowe, stated that Johnson was terrified in part because strange cars were following him, and Johnson himself testified that he was frightened by being followed. Even if Dubian's conduct was not the sole, initial, or primary cause of Johnson's symptoms, the jury could reasonably have concluded that the surveillance activity was a substantial factor in causing Johnson's distress, warranting a liability finding and a damages award. See Edgecomb v. Great Atlantic & Pacific Tea Co., 18 A.2d ___ ________ __________________________________ 364, 365 (Conn. 1941) (holding that causation exists when the -10- 10 defendant's action was a substantial factor in producing the plaintiff's damages); Antz v. Coppolo, 75 A.2d 36, 39 (Conn. ____ _______ 1950) (same); Kilduff v. Kalinowski, 71 A.2d 593, 594-95 _______ __________ (Conn. 1950) (same). B. The Union's Liability _____________________ 1. Standard of Proof _________________ The Union argues that the Johnsons' suit stems from a labor dispute and that therefore its liability should be governed by the "clear proof" requirement of the Norris- LaGuardia Act, 29 U.S.C. 106, infra.  _____ Johnson sued his labor union for the harassment he suffered after testifying against other Union members at an arbitration hearing. Whether the events underlying the suit can be characterized as a labor dispute for the purposes of  106 of the Norris-LaGuardia Act is a close question. See ___ Columbia River Packers Ass'n v. Hinton, 315 U.S. 143, 145-47 _____________________________ ______ (1942) (holding that the critical element in determining whether the provisions of the Norris-LaGuardia Act apply is whether the employer-employee relationship is the matrix of the controversy); Jacksonville Bulk Terminals, Inc. v. _____________________________________ International Longshoremen's Association, 457 U.S. 702, 712- ________________________________________ 13 (1982) (same) (citing Columbia River). But since the _______________ "clear proof" standard is not determinative of any of the issues before us, this is a question we need not decide. -11- 11 Even applying the "clear proof" standard, the judgment against the Union stands. 2. Intentional Infliction of Emotional Distress ____________________________________________ There was "clear proof" to support the jury's finding of Union liability for intentional infliction of emotional distress. It is undisputed that there were numerous acts of harassment by employees, all of whom were Union members, which caused Johnson great emotional distress. The issue is whether the Union itself may properly be held responsible for its members' conduct here. Under the Norris-LaGuardia Act, a union may be held liable for the acts of its members in the course of a labor dispute only "upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." 29 U.S.C. 106. The Supreme Court has interpreted this requirement to mean that a plaintiff must present clear and convincing proof "either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in further acts which were in themselves actionable under state law or intentionally drew upon the previous violence for their force." United Mine Workers of America v. ______________________________ Gibbs, 383 U.S. 715, 739 (1966). _____ -12- 12 There is sufficient evidence in the record for a jury to infer that the Union knowingly at least tolerated its members' conduct and perhaps actively encouraged it. The evidence showed that many persons associated with the Union, including both rank and file Union members and Union leaders, unquestioningly interpreted the Union's written policy against harming a member as very broadly including an unwritten rule against turning in fellow members for stealing meat. The jury could have inferred that the Union would have wanted its members to enforce that rule against all violators, including Johnson. The policy against harming a Union member was mentioned at a Union meeting about Johnson, and Dawn Mitchell, the acting Union steward, separately told Johnson he should not turn in stealing employees because of the policy. Moreover, Dennis Kawa, a long-time Sweet Life employee, testified that although more than ten individuals were involved in stealing meat over a period of years and although this thievery was common knowledge among the Union members, he himself did not tell the Company about any of it because, "It's a rule." A reasonable jury could have found that in accepting and promoting this broad interpretation of the rule in Johnson's case, the Union knowingly tolerated and even encouraged its members' harassment of Johnson as punishment for his, as it were, improper "ratting" on Union members. -13- 13 A finding of Union toleration of its members' harassing actions against Johnson is also supported by evidence pertaining to the Union's officers, Gilmartin and Dubian.2  Dubian, as already discussed, personally harassed Johnson by surveillance from a car following Johnson's leaving the employ of Sweet Life. Although Gilmartin wrote a letter to Donald Oswald, Sweet Life's general manager, promising to do everything in his power to stop the harassment, the actions he actually took were quite limited. The bulk of Gilmartin's efforts consisted of two meetings he held with the Union members at which he spoke against the graffiti generally and the racial slurs in particular. At one of these meetings, Gilmartin also said if anyone did anything to harm a Union brother, he would do everything in his power to "take care of it."  The jury could conclude that by his comments against the racial slurs and graffiti, Gilmartin was mainly attempting to protect the other African-American Union members, not Johnson. This interpretation would be  ____________________ 2. The district court set aside the verdict against Gilmartin for intentional infliction of emotional distress, indicating that it believed the evidence was insufficient.  Whether or not the court was correct to do so is an issue we do not reach since the Johnsons' cross-appeal was untimely, infra. We are nonetheless free to take account of the _____ evidence against Gilmartin in deciding whether the evidence as a whole suffices for us to affirm the district court's approval of the jury verdict against the Union.  -14- 14 consistent with Gilmartin's letter to Oswald, in which he wrote that the Union had urged its members to refrain from "unnecessary racial remarks" to Johnson because, "That insults all black members." A reasonable jury could also have understood Gilmartin's promise to "take care of" anyone who harmed a Union brother as more likely a threat against Johnson than a warning to Johnson's harassers. In summary, the jury could infer from the Union's unabashed policy against "ratting" on members who stole meat, from Dubian's harassing surveillance, from Gilmartin's veiled threat to "take care of" anyone who harmed a Union brother, and from the failure of Gilmartin and other Union officials to take more vigorous measures to check members' harassment of Johnson, that the Union tolerated and even encouraged its members' harassment in retribution for Johnson's having testified against the accused members. We believe this proof of Union participation in the infliction of emotional distress upon Johnson was sufficiently clear to meet the standard of 29 U.S.C. 106. 3. Assault _______ The Union contends that there was insufficient evidence for the jury to find it liable for its members' assaults upon Johnson. We do not agree. The same factors listed above as sufficient to show Union participation in the infliction of emotional distress upon Johnson suffice to show -15- 15 participation in any assaults that the Union's members committed as a part of the harassment visited upon Johnson. The question of whether or not the members' harassing behavior included assaults was put to the jury with instructions that were not objected to. The Union did not at trial question that the evidence created a jury issue as to the occurrence of assaults upon Johnson, nor does it do so on appeal.3 The jury was entitled to find that the members' behavior, continuing over a period of several months, was well known to Union officials and that the Union participated by "knowing tolerance." United Mine Workers v. Gibbs, 383 ___________________ _____ U.S. at 739. The jury's conclusion that the Union shared in the responsibility for the harassing conduct, including in any assaults, was supported, in our view, by "clear evidence," hence meeting the higher standard of the Norris- LaGuardia Act as well as the common law agency standard of  ____________________ 3. The legal issue as to whether some of the harassing conduct amounted to assaults turned on whether the conduct embodied a sufficiently imminent threat of bodily harm. See ___ Comrie v. Hinds, No. CV 930521854S, 1996 WL 240419 at *2 ______ _____ (Conn. Super. April 18, 1996) (holding that an assault cannot be accomplished by words alone; there must be an overt act evidencing some corporeal threat); 6A C.J.S. Assault & Battery 4 (1975) ("While an offer to do physical violence is an essential element of an actionable assault, a mere threat or offer of violence is ordinarily not alone sufficient; it is also usually essential that defendant have the present means or ability to carry his threat into execution."); 6 Am. Jr. 2d Assault & Battery 3 (1963) ("Generally speaking, an assault is a demonstration of an unlawful intent by one person to inflict immediate injury on the person of another then present."). There was no evidence here of actual batteries upon Johnson. -16- 16 implied authorization. See generally Beckenstein v. Potter _____________ ___________ ______ and Carrier, Inc., 464 A.2d 6 (Conn. 1983); Trinity Rent-A- _________________ _______________ Car, Inc. v. Heating Service & Installation Co., 233 A.2d 151 _________ __________________________________ (Conn. Cir. Ct. 1967); Restatement (Second) of Agency 7, 8, & 8A (1958).  4. The Special Verdict Form ________________________ In its final point of error, the Union argues that it is entitled to a new trial because the special verdict form did not mention the "clear proof" requirement. Instead, the form asked the jury whether it had found the Union liable for assault and intentional infliction of emotional distress by a preponderance of the evidence. We shall assume arguendo, for the purpose of discussing this point of error, that the "clear proof" standard did, in fact, apply. If the "clear proof" standard did not apply, the Union could not, of course, complain about the district court's failure to mention the elevated standard in the special verdict form. The questions in a special verdict form must be "reasonably capable of an interpretation that would allow the jury to address all factual issues essential to judgment." United States v. Real Property Located at 20832 Big Rock Dr., _____________ ___________________________________________ 51 F.3d 1402, 1408 (9th Cir. 1995). However, the court's instructions to the jury as well as the wording of the special verdict form are examined as a whole to determine if -17- 17 they fairly presented the issues to the jury. See Carvalho ___ ________ v. Raybestos-Manhattan, Inc., 794 F.2d 454-55 (9th Cir. __________________________ 1986); Mangold v. California Public Utilities Commission, 67 _______ ______________________________________ F.3d 1470, 1475 (9th Cir. 1995) (same) (quoting Carvalho). ________ "When, therefore, the general charge adequately directs the jury to its duties in answering the questions submitted to it there is no need to accompany the submission with repetitive instruction." Lawrence v. Gulf Oil Corp., 375 F.2d 427, 429 ________ ______________ (3d Cir. 1967). The district court was extremely clear in instructing the jury that it was only to find the Union liable if there was clear and convincing evidence of the Union's participation in the harassment of Johnson and the assaults against him. The phrase "clear and convincing evidence" appears no fewer than nine times in the court's discussion of the Union's potential liability. The court defined "clear and convincing evidence" and compared it to the preponderance standard. Once the Union's responsibility was established, each of the state law claims still had to be proven by a preponderance of the evidence. Thus the special verdict form stated that the jury should find for the plaintiff if it believed Johnson had proved his claims by a preponderance of the evidence. The court carefully explained the distinction -18- 18 between finding the Union responsible and finding that the elements of the torts had occurred.  While it would have been plainer had the district court broken down the liability questions into the two separate issues of Union responsibility and occurrence of the tort elements, the instructions and the special verdict form, viewed together, were sufficiently clear. We find no error, therefore, in the court's omission of a reference to the "clear proof" standard in the special verdict form. C. Gilmartin's Liability _____________________ In their cross-appeal, the Johnsons contend that the district court erred when it overturned the jury's judgment in their favor on their claims against Gilmartin for intentional infliction of emotional distress and loss of consortium. This cross-appeal was, however, filed too late to give this court jurisdiction over the Johnsons' appeal. As "[t]imely filing of a notice of appeal is 'mandatory and jurisdictional'", Acevedo-Villalobos v. Hernandez, 22 F.3d __________________ _________ 384, 387 (1st Cir. 1994), cert. denied, 115 S. Ct. 574 (1994) ____________ (citations omitted), we dismiss the Johnsons' cross-appeal for lack of appellate jurisdiction. There has been a split in authority among the circuits as to whether the late filing of a notice of a cross-appeal has the same dire jurisdictional consequences as _____ does the late filing of an appeal. Some of the circuits have -19- 19 held that courts should use a "rule of practice" approach allowing more flexibility in administering the 14-day requirement applicable to cross-appeals. See Young Radiator ___ _______________ Co. v. Celotex Corp., 881 F.2d 1408, 1415-17 (7th Cir. 1989) ___ _____________ (citing cases on both sides); United States v. Lumbermens _____________ __________ Mutual Casualty Co., Inc., 917 F.2d 654, 662 (1st Cir. 1990) __________________________ (recognizing the split but not adopting a rule) (citing Young _____ Radiator).  ________ In Young Radiator, while noting the earlier circuit ______________ split, the Seventh Circuit inferred from the Supreme Court's recent decision in Torres v. Oakland Scavenger Co., 487 U.S. ______ _____________________ 312 (1988), that the timely filing of a cross-appeal should henceforth be treated as mandatory and jurisdictional. Although Torres dealt only with whether the failure to name a ______ party presented a jurisdictional bar to appeal, the Young _____ Radiator court believed that the Supreme Court's broad ________ language in that case, about the mandatory nature of the timing rules in Federal Rules of Appellate Procedure 3 and 4, indicated that the time limit for cross-appeals in Rule 4(a)(3) was also jurisdictional.  The two circuits employing the "rule of practice" approach to have reconsidered this issue after Torres have ______ either expressly held that Torres rendered the cross-appeal ______ time limit jurisdictional or have stated as much in dicta. See EF Operating Corp. v. American Bldgs., 993 F.2d 1046, ___ ___________________ ________________ -20- 20 1049 n.1 (3d Cir. 1993) (holding that the cross-appeal time limit is jurisdictional); Stockstill v. Petty Ray __________ ___________ Geophysical, 888 F.2d 1493, 1496-97 (5th Cir. 1989) (stating ___________ in dicta that it is "doubtful" whether cases adopting the rule of practice approach remain good law after Torres). We ______ agree, post-Torres, that the cross-appeal time limit in ______ Federal Rule of Appellate Procedure 4(a)(3) is mandatory and jurisdictional.4 See also Fed. R. App. P. 26(b) ("[T]he _________ court may not enlarge the time for filing a notice of appeal, a petition for allowance, or a petition for permission to appeal.") A notice of appeal must be filed with the clerk of the district court within 30 days after the date of entry of the judgment or order appealed from. Fed. R. App. P. 4(a)(1). A cross-appeal must be filed within 14 days after the date when the first notice of appeal was filed or within  ____________________ 4. Although the core holding in Torres has been superseded ______ by the 1993 amendments to the Federal Rules of Appellate Procedure, see Fed. R. App. P. 3(c) ("An appeal will not be ___ dismissed . . . for failure to name a party whose intent to appeal is otherwise clear from the notice."); Garcia v. Wash, ______ ____ 20 F.3d 608-09 (5th Cir. 1994) (per curiam), the advisory committee notes to that amendment state that the amendment was intended to put an end to the satellite litigation over whether an ambiguous reference to a party was sufficient to identify an appellant under Torres. Fed. R. App. P. 3(c) ______ advisory committee's note. The amendment does not indicate any intent to change the mandatory nature of the time limits in Rules 3 and 4. Nor has there been any corresponding amendment to Rule 26(b), which prohibits courts from enlarging the time for filing a notice of appeal and upon which the Torres court in part relied. ______ -21- 21 the time otherwise prescribed by Appellate Rule 4(a). Fed. R. App. P. 4(a)(3). Under the provisions of Appellate Rule 4(a)(4), the timely filing of certain types of motions, such as motions under Federal Rules of Civil Procedure 50(b) or 59, will extend the time for appeal for all parties, causing the time limits to run from the date of the entry of the order disposing of the last such motion outstanding. The district court entered its judgment on May 24, 1995. But on June 8, 1995, the defendants timely served a motion under Rules 50(b) and 59, thereby extending the time available for filing an appeal. The district court entered its orders deciding this motion on September 28, 1995. The defendants timely filed their notice of appeal within 30 days, on October 25, 1995. But the Johnsons did not file their cross-appeal until November 13, 1995, 19 days after the defendants filed their notice of appeal. Their filing was five days too late. The plaintiffs' only argument would be to rely on Dubian's October 11, 1995 Additional Motion for Judgment as a Matter of Law or in the Alternative for New Trial or for Amendment of Judgment to make their cross-appeal timely. The district court did not dispose of this motion until November -22- 22 16, 1995, potentially making the plaintiffs' cross-appeal merely premature.5  However, Dubian's October 11th motion did no more than raise for a second time the same issue Dubian had raised in his June 8th motion, an issue the court had decided against him on September 28 namely, whether Dubian's conduct in driving by the Johnson home repeatedly could form the basis of Dubian's personal liability for intentional infliction of emotional distress. As the Sixth Circuit has written: "[A] motion to reconsider an order disposing of a [time tolling post-trial] motion of the kind enumerated in Rule 4(a)[(4)] does not again terminate the running of the time for appeal,". . . unless a grant of the earlier post-trial motion effectively results in a new judgment and the motion to reconsider is filed by the adversely affected party requesting reinstatement of the original judgment. Moody v. Pepsi-Cola Metropolitan Bottling Co., Inc., 915 F.2d _____ __________________________________________ 201, 206 (6th Cir. 1990) (quoting Dixie Sand and Gravel v. ______________________ TVA, 631 F.2d 73-4 (5th Cir. Unit B 1980)) (citations ___ omitted). See also Wright v. Preferred Research, Inc., 891 ________ ______ ________________________ F.2d 886, 889-90 (11th Cir. 1990) (per curiam) (same); Acevedo-Villalobos, 22 F.3d at 389 (holding that a second __________________  ____________________ 5. Under Federal Rule of Appellate Procedure 4(a)(4), a premature filing becomes timely upon the disposition of the motion which made the filing premature. -23- 23 motion to reconsider served within ten days of the denial of the first motion does not extend the time period for filing a notice of appeal from the underlying judgment).  Since Dubian's second motion was, in effect, merely a request for reconsideration of his earlier motion, it did not toll the time for appeal and the Johnsons' cross-appeal was not timely. III. Conclusion III. Conclusion We affirm the judgment of the district court. We dismiss the Johnsons' cross-appeal for lack of appellate jurisdiction. In appeal No. 95-2318, costs are awarded to Patricia and Frank Johnson. In appeal No. 95-2319, costs are awarded to Tom Gilmartin, Jr. So Ordered. __________ -24- 24