Arthur MANGOLD; Maurice
F. Crommie, Plaintiffs–
Appellees,

v.

CALIFORNIA PUBLIC UTILITIES COMMISSION; William Ahern; Jeff O'Donnell; Catherine Yap; Ed Texeira; David Morse; Terry Murray; Mark Ziering; Doug Long; Wes Franklin; Jim Pretti; Leona Fong; and Sandy Barsell, and Does 1 through 20, inclusive, Defendants–Appellants.

Nos. 94–15287, 94–15696.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 17, 1995.

Decided Oct. 17, 1995.

Andrea G. Asaro, Rosen, Bien & Asaro, San Francisco, California (Sanford Jay Rosen and Tom Nolan, on the briefs) (merits counsel) and Elliot L. Bien, Law Offices of Elliot L. Bien, San Francisco, California (special attorneys' fees counsel), for defendants-appellants.

Richard Rogers, Mayo & Rogers, San Francisco, California, (Madeleine Tress, with him on the brief) and Richard M. Pearl, San Francisco, California, for plaintiffs-appellees.

Before: D.W. NELSON and T.G. NELSON, Circuit Judges, and KING,* District Judge.

SAMUEL P. KING, District Judge:

Defendants/appellants the California Public Utilities Commission and various individual employees (collectively "the PUC") appeal from judgment after a jury verdict awarding (1) plaintiff/appellee Maurice Crommie $151,-920 plus 10% interest and costs, and (2) plaintiff/appellee Arthur Mangold $164,052 plus 10% interest and costs against the PUC for violating the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, et seq. (ADEA), the California Fair Employment and Housing Act, Cal.Gov.Code §§ 12940, et seq. (FEHA), and California common law. The PUC also appeals from the award of $724,380 in attorneys' fees. We have jurisdiction under 28 U.S.C. § 1291 and we affirm the judgment and fee award, but remand for recomputation of post-judgment interest.

*FACTUAL BACKGROUND*

These two consolidated cases arise from allegations of age discrimination in promotions by the PUC from the mid–1980s to the early–1990s. Mr. Crommie filed his action in state court October 12, 1989; Mr. Mangold, on February 21, 1989. After the cases were removed, Plaintiffs filed amended complaints, and the cases were consolidated. Meanwhile, the EEOC filed class action suits against the PUC on behalf of 43 other PUC workers who were denied promotion opportunities.

Both plaintiffs are engineers. Mr. Crommie had applied for, and was denied, promotion to various regulatory analyst positions from 1983 until 1990 or 1991. Mr. Mangold had applied for, and was denied, supervisor positions from 1986 until 1990. Mr. Crommie began work at the PUC in 1981 at age 54, after extensive experience in the aerospace industry. He has an engineer-

---

* Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting

by designation.

ing undergraduate degree, three master's degrees, and has completed all course work for two doctorate programs. Mr. Mangold has a Bachelor of Science degree with graduate work in engineering, economics and business administration. He spent his entire career at the PUC.

Plaintiffs alleged that, beginning as early as 1983, the PUC had a policy and practice of discrimination against older workers for promotions. The discrimination charges were based on promotional examinations that favored younger employees. The promotional process consisted of several steps. After a position was announced, the employee would apply by submitting a self-evaluation. The applicant's supervisor would comment on the self-evaluation and rate the applicant on a five-point scale. The next-level supervisor would concur or disagree. A promotional readiness examination followed. At issue here are several examinations from 1986 through 1990.

The promotional readiness examinations generally consisted of oral examinations conducted by panels of three or four directors or assistant directors. The questions were subjective. The PUC has argued throughout that the Plaintiffs were not qualified for promotions based on their performance during the examinations. On the other hand, the Plaintiffs' theory at trial was that the examinations were "fixed" because (1) the subjective questions were based on certain "high profile" assignments or positions that were given to younger employees, (2) they were denied access to these high-profile jobs, (3) supervisor evaluations of older employees were lowered so as to rank younger employees higher, (4) the subjective, "consensus" scoring method was biased, (5) standards and entry requirements were lowered for certain positions to allow younger employees to qualify, and (6) the examination panels were staffed with directors for whom younger employees worked.

After Plaintiffs administratively appealed the promotional decisions, the EEOC investigated and issued determinations of reasonable cause in June of 1989 and April of 1991. In addition to witness testimony and documentary evidence, the EEOC relied on sta-

tistics of various examinations showing that the older an employee, the lower the examination score. The EEOC also took issue with some of the questions being asked on the examinations.

The matter was tried before a jury in February and March of 1993. At trial, the Plaintiffs' evidence consisted of witness testimony, documentary evidence, and statistical evidence of an economics expert, Dr. Betty Blecha. The jury found the PUC itself liable for age discrimination under the ADEA and the California FEHA; found retaliation in violation of the ADEA; found individual defendants William Ahern, Catherine Yap, Jeff O'Donnell, and Ed Texeira liable under FEHA; and found that the PUC and the individuals violated state public policy for failure to promote, and for conspiracy to fail to promote. It awarded damages for loss of earnings, liquidated damages, and emotional distress. The court later awarded attorneys' fees under state law. The fees totalled $724,380 after applying a contingent-fee multiplier of two. These appeals followed.

*DISCUSSION*

A. *Liability for discrimination under federal law.*

■ The PUC asserts that the trial court prejudicially erred by allowing the Plaintiffs to proceed on a disparate impact theory of discrimination.[1] Although disparate impact is an appropriate theory under Title VII, the PUC contends it is inappropriate in an age discrimination context. "A failure to submit a proper jury instruction is a question of law reviewable de novo, but an error in instructing the jury in a civil case does not require reversal if it is more probably than not harmless." *Benigni v. City of Hemet,* 879 F.2d 473, 479 (9th Cir.1988) (citations omitted).

"A plaintiff alleging discrimination under ADEA may proceed under two theories of liability: disparate treatment or disparate impact." *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1421 (9th Cir.1990) (citing *Palmer v. United States,* 794 F.2d 534, 536 (9th Cir.1986)).

1. The PUC does not challenge the finding of retaliation in violation of 29 U.S.C. § 623(d).

"Disparate treatment" is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, or other protected characteristics. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.

Claims that stress "disparate impact" by contrast involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive is not required under a disparate-impact theory.

*Hazen Paper Company v. Biggins,* 507 U.S. 604, ——, 113 S.Ct. 1701, 1705, 123 L.Ed.2d 338 (1993) (citations, brackets and ellipses omitted).

Although the Supreme Court applies disparate treatment to the ADEA, the Court acknowledged in *Hazen Paper* that it has "never decided whether a disparate impact theory of liability is available under the ADEA, and we need not do so here." 507 U.S. at ——, 113 S.Ct. at 1706 (citation omitted). Further, there is some indication that the theory should not apply. *Id.* at ——, 113 S.Ct. at 1710 (Kennedy, J., concurring) ("nothing in the Court's opinion should be read as incorporating in the ADEA context the so-called 'disparate impact' theory of Title VII ... and there are substantial arguments that it is improper to carry over disparate impact analysis from Title VII to the ADEA.").

Here, the PUC argues that disparate impact is improper in light of *Hazen Paper.* At least one circuit appears to have so held. *See EEOC v. Francis W. Parker School,* 41 F.3d 1073 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2577, 132 L.Ed.2d 828 (1995).[2] However, existing Ninth Circuit precedent approves of a disparate impact theory under the ADEA. *E.g., Rose,* 902 F.2d at 1421; *see also EEOC v. Local 350,* 998 F.2d 641, 648 n. 2 (9th Cir.1993) ("in this

circuit a plaintiff may challenge age discrimination under a disparate impact analysis").

We need not address here whether disparate impact is a proper theory under the ADEA because the jury found intentional discrimination under a disparate treatment theory.[3] True, the verdict form combined two theories into one interrogatory: "Using the disparate treatment or disparate impact theory of age discrimination, did the [PUC] violate the ADEA federal law and/or the FEHA state law by discriminating against plaintiffs on the basis of age?" However, the jury also found that the plaintiffs' ages were motivating factors in the PUC's employment decisions. It found that the PUC would not have made the same employment decisions regardless of plaintiffs' ages. It found retaliation. It found that some individual defendants violated FEHA by aiding, abetting, inciting, compelling, or coercing an act forbidden by FEHA. It found that the PUC violated fundamental public policy under state law. It found that certain individuals conspired to fail to promote plaintiffs. And it awarded liquidated damages under the ADEA to both plaintiffs. An award of liquidated damages means the jury found that the violation was intentional because the court instructed:

> If you find that the PUC violated the ADEA federal law and you have calculated plaintiffs' damages, you must then decide whether the violation was willful. *The PUC acted willfully if it intentionally and voluntarily denied promotions to plaintiffs because of age.* ... If the PUC willfully violated the law, plaintiffs are entitled to have their damages doubled. This means that you should award them the damages you calculated and add an equal amount of money as liquidated damages under the law. (emphasis added).

Substantial evidence supports the jury's findings. For example, Mr. Crommie testified that a PUC director told him "Maurice, you know we want fresh young blood in this group." After he informed her that he had

---

**2.** *See also Martincic v. Urban Redev. Auth.,* 844 F.Supp. 1073, 1078 (W.D.Pa.1994) (disparate impact not applicable under ADEA).

**3.** Thus, we need not address other issues raised by the PUC regarding the retroactive effect of the 1991 Civil Rights Act on *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).

completed certain graduate courses, she said "You're still too old." A former supervisor of Mr. Mangold testified that duty statements and the examination process were altered to allow younger people to be placed on promotion lists. Another former supervisor of Mr. Mangold testified that high profile assignments were given to younger employees. A memorandum of August 4, 1992 from "Division Directors" stated: "The CPUC's overall effort should be to keep as many of our younger, talented staff employed within the constraints of civil service rules." Previous raters of Mr. Mangold testified that other review committee members pressured them to lower Mr. Mangold's ratings after submission. Similar testimony was elicited regarding Mr. Crommie. One rater admitted hat he was asked to lower the evaluation of Mr. Crommie, while raising the evaluation of a younger employee.

There was ample similar testimony from plaintiffs, coworkers and other raters. There was testimony that the subjective oral examinations consisted of questions that could only be answered correctly by those who held certain positions given to younger people. There was additional testimony that performance evaluations of older workers had been changed to influence promotion ratings. Further, the jury was entitled to draw reasonable inferences from Exh. 126, a letter from the PUC President/Executive Director Weisser to Mr. Mangold responding to a complaint of age discrimination.[4] The letter resulted from a speech to the PUC, where, according to Mr. Crommie, Weisser said "We're going into a bright new future in which we have an excellent staff of young professional people who will be able to carry

us into this bright new future by virtue of their superb education and training." In response to a question, Weisser allegedly responded with words to the effect of "The older employees, unfortunately, don't take advantage of all the opportunities that are offered to them." In sum, substantial evidence supports the jury's verdict of age discrimination under a disparate treatment theory.

### B. The verdict form.

As noted earlier, the first question on the verdict form combined the two theories: "Using the disparate treatment or disparate impact theory of age discrimination, did the [PUC] violate the ADEA federal law and/or the FEHA state law by discriminating against the plaintiffs on the basis of age?" The PUC argues that the trial court erred by combining the theories.

 "[T]he trial court's complete discretion as to whether a special or general verdict is to be returned extends to determining the form of the verdict and interrogatories, provided that the questions asked are adequate to obtain a jury determination of all factual issues essential to judgement." *In re Hawaii Federal Asbestos Cases*, 871 F.2d 891, 894 (9th Cir.1989). "Taken as a whole, the instructions and interrogatories must fairly present the issues to the jury. If the issues are fairly presented, the district court has broad discretion regarding the precise wording of the instructions and interrogatories." *Carvalho v. Raybestos–Manhattan Inc.*, 794 F.2d 454, 455 (9th Cir.1986) (citations omitted).

---

4. The letter reads in part:
 ... all of us should emulate the enthusiasm, tenacity and creativity with which many of our newer employees attack and solve problems. I find it admirable that people newly arrived to an assignment often are willing and able to look at problems from more than one perspective—not simply the one that has worked before.... I believe, as do many others, that employees new to a job tend to be less inhibited by traditional methodologies than those who have been on the same assignment for a long time.

 .... We cannot afford to overlook any talent among the staff regardless of age. We

 know that it is our experienced employees—people who have been here for a while and know what it takes to get things done—that are the ... backbone of this organization. We also believe that fresh vistas can invigorate people who have become jaded after years of doing the same thing.

■ Combining theories in the interrogatory (as distinguished from alleged error in the substantive jury instructions) is alone not reversible error. The jury instructions clearly explained that Plaintiffs were proceeding on both state and federal law. The court explained that state and federal law recognize two theories of discrimination; it detailed the elements and burdens of proof in separate instructions. Although it is preferable not to combine theories,[5] taking the verdict form and instructions together, the discrimination issue was fairly presented to the jury. The additional specific interrogatories made clear which theory the jury was applying. Here, we need not speculate whether the jury's verdict was predicated on an invalid claim. *See Richards v. Michelin Tire Corp.*, 21 F.3d 1048, 1055 (11th Cir. 1994), *cert. denied,* — U.S. —, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995).

■ The PUC argues that the error was prejudicial because the Plaintiffs used disparate impact as an evidentiary vehicle to introduce statistical evidence. However, "[s]tatistics also may be used to establish a prima facie case of discrimination under the disparate treatment theory." *Palmer v. United States,* 794 F.2d 534, 539 (9th Cir.1986) (citing *Diaz v. American Telephone & Telegraph,* 752 F.2d 1356, 1363 (9th Cir.1985)). Thus, because the statistics would have been admissible under either theory, the PUC's claim of undue prejudice fails.

## C. The statistical evidence.

■ The PUC also contends that Dr. Blecha's statistical evidence was unreliable and insufficient to create a prima facie disparate impact case as required by *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994–995, 108 S.Ct. 2777, 2788–2789, 101 L.Ed.2d 827 (1988). *See also Shutt v. Sandoz Crop Protection Corp.,* 944 F.2d 1431, 1433 (9th Cir. 1991), *cert. denied,* 503 U.S. 937, 112 S.Ct. 1477, 117 L.Ed.2d 620 (1992). (The EEOC relied on similar statistics in making its determination of reasonable cause). The PUC argues that Dr. Blecha's statistics only correlated age with promotion, and did not isolate protected class. The statistics tended to show that the older an employee was, the lower the score on the subjective promotion exams. The statistics did not, however, analyze specifically between age 40-or-older versus under–40. The PUC also points out that the statistics did not factor out "repeaters." The PUC reasons that if people fail but continue to retake an exam, the statistics will eventually show higher failure rates for older persons.

However, merely because the statistics did not isolate a 40–and–above category does not render the statistics irrelevant. Part of a prima facie case is to discriminate in favor of "a substantially younger employee with equal or inferior qualifications." *Wallis,* 26 F.3d at 891. The favored people need not necessarily be below age 40. The statistics measured scores on relevant promotional examinations and included the entire pool of test-takers. Dr. Blecha's assumptions and the composition of the promotion pools went towards the weight, not the admissibility, of the statistical evidence. The PUC cross-examined Dr. Blecha fully on these points. Even if the statistical disparities were not so substantial so as to infer causation from the statistics *alone, Watson,* 487 U.S. at 994–95, 108 S.Ct. at 2788–89, the Plaintiffs stress that the statistics were used as evidence to prove intentional discrimination under a "pattern and practice" disparate treatment theory. *See Hazelwood School District v. United States,* 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1854–55, 52 L.Ed.2d 396 (1977). The statistics were relevant and the court did not err in admitting them.

■ The PUC also argues that the court erred in admitting "stray remarks." Specifically, it points to remarks by Ms. Barkovich ("Maurice, you know we want fresh young blood in this group"), Mr. Weisser ("We're going into a bright new future in which we have an excellent staff of young professional people" and "older employees, unfortunately, don't take advantage of all the opportunities that are offered to them"), and "Division

---

5. *See* 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 2508, at 189 (1995) ("Care should be taken to avoid questions that combine two issues disjunctively because a 'yes' or 'no' answer may be construed as referring to either issue.").

Directors" in a draft memorandum ("The CPUC's overall effort should be to keep as many of our younger, talented staff employed within the constraints of civil service rules").

The PUC cites *Merrick v. Farmers Ins. Group,* 892 F.2d 1434, 1438 (9th Cir.1990); *Rose,* 902 F.2d at 1423; and *Selby v. Pepsico, Inc.,* 784 F.Supp. 750, 757–58 (N.D.Cal.1991), *aff'd sub nom., Nesbit v. Pepsico., Inc.,* 994 F.2d 703, 705 (9th Cir.1993), contending that the "stray" remarks were irrelevant to show intent because they were made by nondefendants.

All three cases are distinguishable. In both *Merrick* (referring to a younger selectee as "a bright, intelligent, knowledgeable young man") and *Rose* (referring to senior employees as "part of an old-boy network") the remarks alone were insufficient to withstand summary judgment. Here, on the other hand, there is other evidence in addition to the remarks. *Pepsico* is similarly distinguishable because the remarks there ("Pepsi didn't necessarily like gray hair" and "we don't want a unpromotable fifty-year-olds around") were not tied to the employment decisions. Here, the remarks were by division directors, or by the President of the PUC. The statements were made during the scope of employment by senior decision-makers regarding assignments, promotions, or policies. Even if the remarks *alone* might have been insufficient to withstand summary judgment, however, the remarks were certainly relevant and, along with other substantial evidence, created a strong inference of intentional discrimination. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1989) ("[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision … [although] stereotyped remarks can certainly be *evidence* that gender played a part") (emphasis in original).

### D. *Jurisdictional Requirements of the California Tort Claims Act.*

The PUC next argues that the Plaintiffs' state tort claim for violation of public policy[6] should have been barred because the Plaintiffs failed to comply with notice provisions of the California Tort Claims Act, Cal.Gov't Code §§ 900 et seq. The PUC contends that the Plaintiffs used the state tort claim to introduce prejudicial emotional distress evidence, and points out that the jury awarded compensatory damages for loss of earnings and for emotional distress for violation of public policy.

■ The California Tort Claims Act requires, as a condition precedent to suit against a public entity, the timely presentation of a written claim and the rejection of the claim in whole or in part. *Snipes v. City of Bakersfield,* 145 Cal.App.3d 861, 193 Cal. Rptr. 760, 762 (Cal.App.1983). "Where compliance with the Tort Claims Act is required, the plaintiff must allege compliance or circumstances excusing compliance, or the complaint is subject to general demurrer." *Id.* Although compliance with the Tort Claims Act is not required for state law FEHA claims, *Id.* 193 Cal.Rptr. at 765–66, the PUC contends that compliance is required for the public policy tort. The PUC attempted to dismiss the tort claim before trial, but the court ruled that it waited too long to assert the ground for dismissal.

This issue is moot. The jury awarded damages as follows:

ADEA Federal Law Damages:
Mr. Crommie
Loss of earnings and Benefits: $63,460
Liquidated Damages: $63,460
Mr. Mangold
Loss of earnings and Benefits: $65,462
Liquidated Damages: $65,462
FEHA State Law Damages:
Mr. Crommie
Loss of earnings and Benefits: $63,460
Emotional Distress: $25,000
Mr. Mangold
Loss of earnings and Benefits: $68,590
Emotional Distress: $30,000
California Law, Wrongful Employment Action in Violation of Public Policy:
Mr. Crommie
Loss of earnings and Benefits: $63,460
Emotional Distress: $25,000
Mr. Mangold
Loss of earnings and Benefits: $68,590
Emotional Distress: $30,000

However, since the Plaintiffs could not obtain double recovery, the court entered judgment in favor of Mr. Crommie for $88,460 ($63,460 loss of earnings plus $25,000 emotional dis-

---

6. *See, e.g., Rojo v. Kliger,* 52 Cal.3d 65, 276 Cal.Rptr. 130, 801 P.2d 373 (1990).

tress under FEHA) and $63,460 liquidated damages under ADEA. Similarly, it awarded Mr. Mangold $98,590 ($68,590 loss of earnings plus $30,000 emotional distress under FEHA) and $65,462 liquidated damages under ADEA. Thus, the state tort award for violation of public policy was redundant. Likewise, there was no prejudice in allowing testimony on emotional distress because emotional distress is allowable for the *statutory* FEHA claim. *See, e.g., Peralta Community College District v. Fair Employment and Housing Commission*, 52 Cal.3d 40, 276 Cal.Rptr. 114, 801 P.2d 357 (Cal.1990). Thus, we need not address whether the public policy tort should have been barred.

### E. *Contingent Fee Multiplier Under State Law.*

The next issue concerns whether state or federal law controls the method of *calculating* an attorneys' fee awarded under state law. The issue arises because in *City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), the Supreme Court held that contingency-fee multipliers are unavailable under federal fee-shifting statutes. California law permits such enhancements under state fee-shifting statutes. *See, e.g., Serrano v. Priest*, 20 Cal.3d 25, 141 Cal.Rptr. 315, 569 P.2d 1303 (1977); *City of Oakland v. Oakland Raiders*, 203 Cal.App.3d 78, 249 Cal.Rptr. 606 (1988). Given that Plaintiffs succeeded on both federal and state statutory grounds (which both provide for fee awards to prevailing parties), the trial court awarded fees based on the state law, Cal. Code Civ.P. § 1021.5 and Cal.Gov't Code § 12965(b). Applying state law, the court enhanced by a multiplier of 2.0, and awarded fees of $637,440.[7] *See Crommie v. California PUC*, 840 F.Supp. 719 (N.D.Cal.1994).

The PUC asserts that, although the right to a fee is a matter of state substantive law, the method of calculating that fee is procedural. Under an *Erie* analysis, the PUC contends that the court erred by applying the multiplier.

■■■ "We review *de novo* the legal question whether state or federal law applies in a diversity action. In construing a state law, we follow the decisions of the state's

highest court." *Harvey's Wagon Wheel, Inc. v. Van Blitter*, 959 F.2d 153, 154 (9th Cir. 1992) (citation omitted). The *Erie* principles apply equally in the context of pendent jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 540 n. 1 (2d Cir.1956).

■■■ The PUC's argument fails. Existing Ninth Circuit precedent has applied state law in determining not only the right to fees, but also in the method of calculating the fees. *See, e.g., Kern Oil and Refining Co. v. Tenneco Oil Co.*, 792 F.2d 1380 (9th Cir.1986), *cert. denied*, 480 U.S. 906, 107 S.Ct. 1349, 94 L.Ed.2d 520 (1987). *Shakey's Inc. v. Covalt*, 704 F.2d 426 (9th Cir.1983), cited by the PUC, is not to the contrary. In *Shakey's*, the court held that state substantive law governs the award of fees in diversity actions, but the decision whether to hold an evidentiary hearing in deciding the fee question is procedural. 704 F.2d at 435. Whether to hold a hearing is a matter of court administration, whereas calculation of the amount of the fee is bound up in the substantive state right.

Further, we follow other circuits that apply state law in calculating the fee. *E.g., Northern Heel Corp. v. Compo Industries*, 851 F.2d 456, 475 (1st Cir.1988); *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 53 (2d Cir.1992). One circuit has done so in the same context as here where a multiplier was used under state law because *Dague* precluded it under federal law. *Davis v. Mutual Life Ins. Co. of New York*, 6 F.3d 367, 382–83 (6th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1298, 127 L.Ed.2d 650 (1994).

The PUC maintains that no case of this circuit has analyzed and considered the *Erie* issue regarding calculating the fee. The PUC also argues that in *Dague* the Supreme Court established a "rule of federal practice" regarding fee-shifting jurisprudence. As a federal rule, the PUC asserts that the practice falls within the holding of *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14

---

**7.** The court later awarded additional fees for defending a motion for reconsideration, and also multiplied those fees by 2.0, for a supplemental award of $86,940.

L.Ed.2d 8 (1965). The PUC's position is that, as a "federal rule," *Dague* must be applied unless it abridges, enlarges, or modifies a state substantive right. *Hanna*, 380 U.S. at 471–73, 85 S.Ct. at 1144–45. These arguments fail. *Dague* is decisional law (not a federal rule) interpreting procedures under federal statutes. *Dague*'s applicability to a federal court's application of state fee-shifting statutes should be analyzed, if at all, under "the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the law." *Hanna*, 380 U.S. at 468, 85 S.Ct. at 1142.

Applying *Hanna*, the availability of a multiplier for fees in state court, but not in federal court, would likely lead to forum-shopping. As this case illustrates, if a multiplier is procedural, a significant difference in fees would be available in state court but not in federal court—an "inequitable administration of the law." The method of calculating a fee is an inherent part of the substantive right to the fee itself, and a state right to an attorneys' fee reflects a substantial policy of the state. *Cf. Chambers v. NASCO*, 501 U.S. 32, 51–55, 111 S.Ct. 2123, 2136–38, 115 L.Ed.2d 27 (1991). The trial court did not err in applying state law to calculate the fees available under state law.

The PUC also argues that we should predict California law and find that, in light of *Dague*, the California Supreme Court will no longer allow contingent-fee enhancements. The California Supreme Court approved of such enhancements in *Serrano v. Priest*, 141 Cal.Rptr. at 329, 569 P.2d at 1317, and has continued to allow enhancements since then. *See, e.g., Maria P. v. Riles*, 43 Cal.3d 1281, 240 Cal.Rptr. 872, 743 P.2d 932 (1987).

Generally, California courts follow federal precedent in interpreting FEHA. *Nesbit v. Pepsico*, 994 F.2d at 704. However, although *Dague* arguably calls into question California's continued reliance on *Serrano*, we cannot decide that the California Supreme Court will necessarily adopt *Dague* as California law for its fee-shifting statutes. Only if there is no precedent or "convincing evidence that the highest court of the state would decide differently," *Andrade v. City of Phoenix*, 692 F.2d 557, 559 (9th Cir.1982) (citation omitted), would we need to predict state law.

"The ... duty of the federal court is to ascertain and apply the existing California law, not to predict that California may change its law...." *Klingebiel v. Lockheed Aircraft Corp.*, 494 F.2d 345, 346 (9th Cir. 1974) (footnote omitted). We apply existing California precedent and affirm the use of a multiplier.

## F. *Multiplier for Fees on Fees.*

Next, the PUC argues that the trial court erred in assessing a multiplier to its award of fees for pursuing fees. It cites *King v. Palmer*, 906 F.2d 762, 769 (D.C.Cir. 1990), *superseded en banc on other grounds*, 950 F.2d 771 (D.C.Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 3054, 120 L.Ed.2d 920 (1992) ("we doubt that lawyers require special incentives to pursue their own compensation"); *see also Clark v. City of Los Angeles*, 803 F.2d 987, 992 (9th Cir.1986). State law, however, applies to this question, and California authority allows multipliers for fee-on-fee awards. *Downey Cares v. Downey Community Dev. Comm'n.*, 196 Cal.App.3d 983, 242 Cal.Rptr. 272, 280 (1987). Accordingly, the trial court did not err in applying the multiplier here.

## G. *Post–Judgment Interest Rate.*

Finally, the PUC points out (and the Plaintiffs concede) that the trial court erred when it awarded post-judgment interest at a 10% rate, payable from the date the verdict (rather than the judgment) was entered. "Post-judgment interest is determined by federal law." *Northrop Corp. v. Triad Intern. Marketing S.A.*, 842 F.2d 1154, 1155 (9th Cir.1988). In this regard, 28 U.S.C. § 1961 provides in pertinent part:

interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment.

Thus, we remand for a determination of the correct interest rate payable from date of entry of final judgment, and entry of a corrected judgment.

*CONCLUSION*

We remand on the post-judgment interest issue, but affirm in all other respects.