UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 95-2318

PATRICIA JOHNSON, ET AL.,
Plaintiffs, Appellees,

v.

TEAMSTERS LOCAL 559, ET AL.,
Defendants, Appellants.


No. 95-2319

PATRICIA JOHNSON, ET AL.,
Plaintiffs, Appellants,

v.

TEAMSTERS LOCAL 559, ET AL.,
Defendants, Appellees.



APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Frank H. Freedman, U.S. Senior District Judge] 



Before

Selya, Circuit Judge, 
Campbell, Senior Circuit Judge,  
and Boudin, Circuit Judge. 



Daniel B. Edelman, with whom Yablonski, Both & Edelman and Burton 
S. Rosenberg were on brief, for Teamsters Local 559, et al. 
Terrence A. Low, with whom Rosen, Greenhut, Catuogno & Low and 
Patricia Bobba Donovan were on brief, for Patricia Johnson, et al. 


December 13, 1996


CAMPBELL, Senior Circuit Judge. In the principal 

appeal now before us, Teamsters Local 559 and Robert Dubian

appeal from state law tort judgments against them arising out

of a workplace conflict. They argue, inter alia, that there

is insufficient evidence to support the judgments under the

Norris-LaGuardia Act's "clear proof" requirement.

I.  I. 

Frank Johnson worked at Sweet Life Foods ("the

Company" or "Sweet Life") in Suffield, Connecticut and was a

member of Teamsters Local 559 ("the Union"). He sued the

Union and two of its officers, Robert Dubian and Tom

Gilmartin, Jr., alleging violations of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. 2000e et seq., and asserting 

pendent state law claims for intentional infliction of

emotional distress and assault. Patricia Johnson, Frank

Johnson's wife, sued for loss of consortium. 

The district court, in a bench trial, found for all

three defendants on Johnson's Title VII claims. Johnson did

not appeal from this determination.

The pendent state law claims were tried to a jury

which returned verdicts against the Union, Dubian and

Gilmartin for intentional infliction of emotional distress

and loss of consortium. The jury also returned a verdict

against the Union, but not against Dubian or Gilmartin, for

assault. The jury assessed damages against the Union of

-2- 2

$120,000 for intentional infliction of emotional distress,

$35,000 for loss of consortium, and $105,000 for assault.

The jury found Dubian liable for $35,000 on the intentional

infliction claim and $35,000 on the loss of consortium claim.

Gilmartin was found liable for $40,000 on the intentional

infliction claim and for an additional $40,000 on the loss of

consortium claim.

Responding to the defendants' Rule 50(b) motion,

the district court entered judgment as a matter of law for

Gilmartin, ruling that no reasonable jury could have found

him liable for intentional infliction of emotional distress

and loss of consortium. However, the court let stand the

jury's verdicts against the Union and Dubian. The latter now

appeal from the judgments against them, and the Johnsons

cross-appeal from the court's entry of judgment as a matter

of law in Gilmartin's favor. 

II. II.

We recite the facts as they might reasonably have

been found by the jury. Sweet Life, a food distributor,

suspected that it was losing significant amounts of meat to

employee theft, and so it placed secret cameras in the work

area to discover who was responsible. From what was

uncovered, it appeared that over ten employees were involved

in the thefts, which had gone on for four or five years and

were common knowledge among the employees, all of whom were

-3- 3

also Union members. Several employees were caught stealing

on tape and were fired. One of the tapes showed Johnson

opening up a crate of meat, although it did not reveal him in

the act of actually stealing meat. The Company confronted

Johnson with the tape and threatened that he would be fired

if he did not reveal the names of other employees responsible

for the thefts. The Union had a written policy

against harming a Union brother. Both Union officials and

members interpreted this policy as prohibiting one member

from "ratting" on another. Dawn Mitchell, the acting Union

steward, told Johnson he should allow himself to be

terminated rather than reveal the names of the employees who

were stealing because of this Union policy against turning in

a Union brother. Gilmartin also told Johnson about this

policy. Dennis Kawa, a Sweet Life worker and Union witness,

stated that he did not report any of the many incidents of

stealing he saw by various Union members because "[i]t's a

rule" not to turn in a Union brother.

Johnson ignored Mitchell's advice and provided the

company with the names of three men he said he had seen

stealing. The Company fired these men entirely on the basis

of Johnson's information. The three fired men filed a

grievance with the Union, and an arbitration hearing was set

for April 29, 1986.

-4- 4

Starting before and intensifying after the

arbitration hearing, unidentified employees of Sweet Life,

who were also Union members, began harassing Johnson. They

wrote threatening messages on the bathroom walls such as,

"Frank, where will you be when the lights go out?"; "559

Rule"; "There's only one thing worse than a rat--a nigger

rat"; "The rat will never work again when we get through with

him, nowhere"; "Frank Johnson is as good as dead, 4/29/86";

"Bye bye Frank. Look for another job."; "Who didn't pass

spear chucking school?"; "559 rules Frank Johnson"; "Call me"

(with Johnson's phone number); and "Frank Johnson's a

squealing nigger rat." The walls were painted several times,

but the graffiti persisted.

These anonymous Union members also made rat and pig

noises when around Johnson; put pieces of wood in the keyhole

of Johnson's forklift; placed buckets of water on the top of

Johnson's forklift; sang "slave songs" such as "Swing Low

Sweet Chariot" at him during every hourly break, every day;

drew pictures of rats on Johnson's locker and on the walls;

threw peanut shells and a milk carton at him; hung a rubber

chicken on his forklift; and ostracized him socially. This

harassment involved a large number of employees all of

whom, as said, were Union members and only intensified as

time went on. 

-5- 5

At the arbitration hearing, Gilmartin, the Union

Business Agent and the officer primarily responsible for

enforcing the Union's collective bargaining agreement with

the Company, defended the three accused employees and

convinced the arbitration panel to reinstate them and award

them back pay. He accomplished this primarily by casting

doubt on Johnson's testimony and accusing him of stealing

meat. Gilmartin charged that the tape shown at the hearing

portraying Johnson opening a crate of meat had been edited;

the original tape, he said, had also shown Johnson actually

putting meat into his pocket.

Gilmartin and the Union were at all relevant times

aware of the harassment of Johnson. Gilmartin held two

meetings with the Union members. At the first meeting,

before the arbitration hearing, Gilmartin stated that he

would personally "take care of" anyone who harmed a Union

brother. Either at that meeting or at the other, Gilmartin

stated that he disagreed with people's writing on the walls

and that anyone actually caught doing so would be fired. He

indicated that he opposed the racial epithets and that they

were offensive to the other African-American members.

Sweet Life provided Johnson with guards to escort

him to and from work and to watch over his home. For

security reasons, Johnson left work a few minutes early each

day. The Company wanted to pay him as if he were not missing

-6- 6

this time, but Gilmartin opposed paying Johnson without an

agreement from Sweet Life to pay all people who left early

under extraordinary circumstances. When the Company went

ahead and paid Johnson anyway, Gilmartin filed a grievance.

As a result of the harassment, Johnson suffered

from Post-Traumatic Stress Disorder for which he sought

psychiatric treatment. He became paranoid and was unable to

sleep or interact normally with his wife and family. He

became increasingly depressed and began drinking regularly.

His psychiatrist placed him on antidepressant and antianxiety

medication. On August 12, 1986, Johnson left Sweet Life

because of his psychiatric condition.

After Johnson's departure, Dubian, the Union's

Secretary-Treasurer, drove by Johnson's home in a Union-owned

car several times a day for a period of some three weeks.

Dubian testified that the purpose of these visits was to

determine if Johnson had found new employment. The three

fired employees had filed charges against Johnson for

breaking the Union's rule against harming a Union brother.

If Johnson were working elsewhere, he would no longer be

subject to the Union's authority, and Dubian could dismiss

the charges.

On appeal, Dubian argues that there was

insufficient evidence in the record to support the jury's

-7- 7

judgment against him for intentional infliction of emotional

distress. 

The Union contends that because the underlying

arbitration hearing involved a labor dispute, the Johnsons'

claims are governed by the Norris-LaGuardia Act's "clear

proof" requirement.1 The Union believes that under this,

more rigorous, standard, there is insufficient evidence to

support the judgments against it for intentional infliction

of emotional distress and for assault. Even if there is

sufficient evidence, the Union contends that the fact that

the special verdict form did not mention the "clear proof"

requirement necessitates a new trial. In their cross-appeal,

the Johnsons argue that the court erred in entering judgment

as a matter of law for Gilmartin on the intentional

infliction of emotional distress and loss of consortium

claims because there was sufficient evidence to validate the

jury's finding.

III. III.

A. Dubian's Liability 

Dubian argues that his conduct in driving by the

Johnsons' home and following Johnson when he left his house

for a period of three weeks was not the sort of "extreme and

outrageous" behavior that can justify a judgment for

 

1. 29 U.S.C. 106.

-8- 8

intentional infliction of emotional distress under

Connecticut law. See Petyan v. Ellis, 510 A.2d 1337, 1342 

(Conn. 1986). He also argues that the jury could not

reasonably have concluded that he intended to cause Johnson

distress or that he succeeded in doing so. We disagree.

Dubian plainly knew that Johnson had just resigned

from Sweet Life after working in a viciously hostile work

environment in which he was subjected to daily threats and

insults. As a Union officer closely associated with these

events, Dubian could be inferred to have known of the extent

of the abuse imposed upon Johnson and of its emotional and

psychological impact, resulting in his departure from the

Company. Given Johnson's recent history, the jury could have

found that Dubian's conduct in driving by Johnson's house in

a Union car several times a day for three weeks, and

following Johnson, was intentional harassment that met the

"extreme and outrageous" standard.

This case is different from Thorpe v. Mutual of 

Omaha Ins. Co., 984 F.2d 541, 545-46 (1st Cir. 1993), in 

which we held that an insurance company's surveillance aimed

at determining the activities of an insured who claimed to

have become totally disabled did not constitute extreme and

outrageous conduct. The insurance company's proffered

reasons for the surveillance were plausible and legitimate in

the circumstances. Dubian's stated reason for driving by

-9- 9

Johnson's house over thirty times in three weeks was that he

wished to determine whether Johnson was working so that he

could drop Union charges made against Johnson by the three

fired employees. A reasonable jury could have found that

this explanation was at best flimsy and at worst absurd.

Conduct which might be acceptable when done for a legitimate

reason can be extreme and outrageous if unjustifiably

performed simply to inflict harm. 

The jury could easily have rejected Dubian's

tendered justification as lacking in plausibility, and could

reasonably have found that his true intent in driving by the

Johnson home was to harass and cause distress to Johnson.

There was also evidence from which the jury could

have concluded that Dubian's surveillance contributed to

causing Johnson's psychological injury. Johnson's

psychiatrist, George Milowe, stated that Johnson was

terrified in part because strange cars were following him,

and Johnson himself testified that he was frightened by being

followed. Even if Dubian's conduct was not the sole,

initial, or primary cause of Johnson's symptoms, the jury

could reasonably have concluded that the surveillance

activity was a substantial factor in causing Johnson's

distress, warranting a liability finding and a damages award.

See Edgecomb v. Great Atlantic & Pacific Tea Co., 18 A.2d 

364, 365 (Conn. 1941) (holding that causation exists when the

-10- 10

defendant's action was a substantial factor in producing the

plaintiff's damages); Antz v. Coppolo, 75 A.2d 36, 39 (Conn. 

1950) (same); Kilduff v. Kalinowski, 71 A.2d 593, 594-95 

(Conn. 1950) (same).

B. The Union's Liability 

1. Standard of Proof 

The Union argues that the Johnsons' suit stems from

a labor dispute and that therefore its liability should be

governed by the "clear proof" requirement of the Norris-

LaGuardia Act, 29 U.S.C. 106, infra.  

Johnson sued his labor union for the harassment he

suffered after testifying against other Union members at an

arbitration hearing. Whether the events underlying the suit

can be characterized as a labor dispute for the purposes of 

106 of the Norris-LaGuardia Act is a close question. See 

Columbia River Packers Ass'n v. Hinton, 315 U.S. 143, 145-47 

(1942) (holding that the critical element in determining

whether the provisions of the Norris-LaGuardia Act apply is

whether the employer-employee relationship is the matrix of

the controversy); Jacksonville Bulk Terminals, Inc. v. 

International Longshoremen's Association, 457 U.S. 702, 712- 

13 (1982) (same) (citing Columbia River). But since the 

"clear proof" standard is not determinative of any of the

issues before us, this is a question we need not decide.

-11- 11

Even applying the "clear proof" standard, the judgment

against the Union stands.

2. Intentional Infliction of Emotional Distress 

There was "clear proof" to support the jury's

finding of Union liability for intentional infliction of

emotional distress.

It is undisputed that there were numerous acts of

harassment by employees, all of whom were Union members,

which caused Johnson great emotional distress. The issue is

whether the Union itself may properly be held responsible for

its members' conduct here. Under the Norris-LaGuardia Act, a

union may be held liable for the acts of its members in the

course of a labor dispute only "upon clear proof of actual

participation in, or actual authorization of, such acts, or

of ratification of such acts after actual knowledge thereof."

29 U.S.C. 106.

The Supreme Court has interpreted this requirement

to mean that a plaintiff must present clear and convincing

proof "either that the union approved the violence which

occurred, or that it participated actively or by knowing

tolerance in further acts which were in themselves actionable

under state law or intentionally drew upon the previous

violence for their force." United Mine Workers of America v. 

Gibbs, 383 U.S. 715, 739 (1966). 

-12- 12

There is sufficient evidence in the record for a

jury to infer that the Union knowingly at least tolerated its

members' conduct and perhaps actively encouraged it. The

evidence showed that many persons associated with the Union,

including both rank and file Union members and Union leaders,

unquestioningly interpreted the Union's written policy

against harming a member as very broadly including an

unwritten rule against turning in fellow members for stealing

meat. The jury could have inferred that the Union would have

wanted its members to enforce that rule against all

violators, including Johnson. The policy against harming a

Union member was mentioned at a Union meeting about Johnson,

and Dawn Mitchell, the acting Union steward, separately told

Johnson he should not turn in stealing employees because of

the policy. Moreover, Dennis Kawa, a long-time Sweet Life

employee, testified that although more than ten individuals

were involved in stealing meat over a period of years and

although this thievery was common knowledge among the Union

members, he himself did not tell the Company about any of it

because, "It's a rule." A reasonable jury could have found

that in accepting and promoting this broad interpretation of

the rule in Johnson's case, the Union knowingly tolerated and

even encouraged its members' harassment of Johnson as

punishment for his, as it were, improper "ratting" on Union

members.

-13- 13

A finding of Union toleration of its members'

harassing actions against Johnson is also supported by

evidence pertaining to the Union's officers, Gilmartin and

Dubian.2 

Dubian, as already discussed, personally harassed

Johnson by surveillance from a car following Johnson's

leaving the employ of Sweet Life. Although Gilmartin wrote a

letter to Donald Oswald, Sweet Life's general manager,

promising to do everything in his power to stop the

harassment, the actions he actually took were quite limited.

The bulk of Gilmartin's efforts consisted of two meetings he

held with the Union members at which he spoke against the

graffiti generally and the racial slurs in particular. At

one of these meetings, Gilmartin also said if anyone did

anything to harm a Union brother, he would do everything in

his power to "take care of it." 

The jury could conclude that by his comments

against the racial slurs and graffiti, Gilmartin was mainly

attempting to protect the other African-American Union

members, not Johnson. This interpretation would be

 

2. The district court set aside the verdict against
Gilmartin for intentional infliction of emotional distress,
indicating that it believed the evidence was insufficient. 
Whether or not the court was correct to do so is an issue we
do not reach since the Johnsons' cross-appeal was untimely,
infra. We are nonetheless free to take account of the 
evidence against Gilmartin in deciding whether the evidence
as a whole suffices for us to affirm the district court's
approval of the jury verdict against the Union. 

-14- 14

consistent with Gilmartin's letter to Oswald, in which he

wrote that the Union had urged its members to refrain from

"unnecessary racial remarks" to Johnson because, "That

insults all black members." A reasonable jury could also

have understood Gilmartin's promise to "take care of" anyone

who harmed a Union brother as more likely a threat against

Johnson than a warning to Johnson's harassers.

In summary, the jury could infer from the Union's

unabashed policy against "ratting" on members who stole meat,

from Dubian's harassing surveillance, from Gilmartin's veiled

threat to "take care of" anyone who harmed a Union brother,

and from the failure of Gilmartin and other Union officials

to take more vigorous measures to check members' harassment

of Johnson, that the Union tolerated and even encouraged its

members' harassment in retribution for Johnson's having

testified against the accused members. We believe this proof

of Union participation in the infliction of emotional

distress upon Johnson was sufficiently clear to meet the

standard of 29 U.S.C. 106.

3. Assault 

The Union contends that there was insufficient

evidence for the jury to find it liable for its members'

assaults upon Johnson. We do not agree. The same factors

listed above as sufficient to show Union participation in the

infliction of emotional distress upon Johnson suffice to show

-15- 15

participation in any assaults that the Union's members

committed as a part of the harassment visited upon Johnson.

The question of whether or not the members' harassing

behavior included assaults was put to the jury with

instructions that were not objected to. The Union did not at

trial question that the evidence created a jury issue as to

the occurrence of assaults upon Johnson, nor does it do so on

appeal.3 The jury was entitled to find that the members'

behavior, continuing over a period of several months, was

well known to Union officials and that the Union participated

by "knowing tolerance." United Mine Workers v. Gibbs, 383 

U.S. at 739. The jury's conclusion that the Union shared in

the responsibility for the harassing conduct, including in

any assaults, was supported, in our view, by "clear

evidence," hence meeting the higher standard of the Norris-

LaGuardia Act as well as the common law agency standard of

 

3. The legal issue as to whether some of the harassing
conduct amounted to assaults turned on whether the conduct
embodied a sufficiently imminent threat of bodily harm. See 
Comrie v. Hinds, No. CV 930521854S, 1996 WL 240419 at *2 
(Conn. Super. April 18, 1996) (holding that an assault cannot
be accomplished by words alone; there must be an overt act
evidencing some corporeal threat); 6A C.J.S. Assault &
Battery 4 (1975) ("While an offer to do physical violence
is an essential element of an actionable assault, a mere
threat or offer of violence is ordinarily not alone
sufficient; it is also usually essential that defendant have
the present means or ability to carry his threat into
execution."); 6 Am. Jr. 2d Assault & Battery 3 (1963)
("Generally speaking, an assault is a demonstration of an
unlawful intent by one person to inflict immediate injury on
the person of another then present."). There was no evidence
here of actual batteries upon Johnson.

-16- 16

implied authorization. See generally Beckenstein v. Potter 

and Carrier, Inc., 464 A.2d 6 (Conn. 1983); Trinity Rent-A- 

Car, Inc. v. Heating Service & Installation Co., 233 A.2d 151 

(Conn. Cir. Ct. 1967); Restatement (Second) of Agency 7,

8, & 8A (1958). 

4. The Special Verdict Form 

In its final point of error, the Union argues that

it is entitled to a new trial because the special verdict

form did not mention the "clear proof" requirement. Instead,

the form asked the jury whether it had found the Union liable

for assault and intentional infliction of emotional distress

by a preponderance of the evidence.

We shall assume arguendo, for the purpose of

discussing this point of error, that the "clear proof"

standard did, in fact, apply. If the "clear proof" standard

did not apply, the Union could not, of course, complain about

the district court's failure to mention the elevated standard

in the special verdict form.

The questions in a special verdict form must be

"reasonably capable of an interpretation that would allow the

jury to address all factual issues essential to judgment."

United States v. Real Property Located at 20832 Big Rock Dr., 

51 F.3d 1402, 1408 (9th Cir. 1995). However, the court's

instructions to the jury as well as the wording of the

special verdict form are examined as a whole to determine if

-17- 17

they fairly presented the issues to the jury. See Carvalho 

v. Raybestos-Manhattan, Inc., 794 F.2d 454-55 (9th Cir. 

1986); Mangold v. California Public Utilities Commission, 67 

F.3d 1470, 1475 (9th Cir. 1995) (same) (quoting Carvalho). 

"When, therefore, the general charge adequately directs the

jury to its duties in answering the questions submitted to it

there is no need to accompany the submission with repetitive

instruction." Lawrence v. Gulf Oil Corp., 375 F.2d 427, 429 

(3d Cir. 1967).

The district court was extremely clear in

instructing the jury that it was only to find the Union

liable if there was clear and convincing evidence of the

Union's participation in the harassment of Johnson and the

assaults against him. The phrase "clear and convincing

evidence" appears no fewer than nine times in the court's

discussion of the Union's potential liability. The court

defined "clear and convincing evidence" and compared it to

the preponderance standard.

Once the Union's responsibility was established,

each of the state law claims still had to be proven by a

preponderance of the evidence. Thus the special verdict form

stated that the jury should find for the plaintiff if it

believed Johnson had proved his claims by a preponderance of

the evidence. The court carefully explained the distinction

-18- 18

between finding the Union responsible and finding that the

elements of the torts had occurred. 

While it would have been plainer had the district

court broken down the liability questions into the two

separate issues of Union responsibility and occurrence of the

tort elements, the instructions and the special verdict form,

viewed together, were sufficiently clear. We find no error,

therefore, in the court's omission of a reference to the

"clear proof" standard in the special verdict form.

C. Gilmartin's Liability 

In their cross-appeal, the Johnsons contend that

the district court erred when it overturned the jury's

judgment in their favor on their claims against Gilmartin for

intentional infliction of emotional distress and loss of

consortium. This cross-appeal was, however, filed too late

to give this court jurisdiction over the Johnsons' appeal.

As "[t]imely filing of a notice of appeal is 'mandatory and

jurisdictional'", Acevedo-Villalobos v. Hernandez, 22 F.3d 

384, 387 (1st Cir. 1994), cert. denied, 115 S. Ct. 574 (1994) 

(citations omitted), we dismiss the Johnsons' cross-appeal

for lack of appellate jurisdiction.

There has been a split in authority among the

circuits as to whether the late filing of a notice of a

cross-appeal has the same dire jurisdictional consequences as 

does the late filing of an appeal. Some of the circuits have

-19- 19

held that courts should use a "rule of practice" approach

allowing more flexibility in administering the 14-day

requirement applicable to cross-appeals. See Young Radiator 

Co. v. Celotex Corp., 881 F.2d 1408, 1415-17 (7th Cir. 1989) 

(citing cases on both sides); United States v. Lumbermens 

Mutual Casualty Co., Inc., 917 F.2d 654, 662 (1st Cir. 1990) 

(recognizing the split but not adopting a rule) (citing Young 

Radiator).  

In Young Radiator, while noting the earlier circuit 

split, the Seventh Circuit inferred from the Supreme Court's

recent decision in Torres v. Oakland Scavenger Co., 487 U.S. 

312 (1988), that the timely filing of a cross-appeal should

henceforth be treated as mandatory and jurisdictional.

Although Torres dealt only with whether the failure to name a 

party presented a jurisdictional bar to appeal, the Young 

Radiator court believed that the Supreme Court's broad 

language in that case, about the mandatory nature of the

timing rules in Federal Rules of Appellate Procedure 3 and 4,

indicated that the time limit for cross-appeals in Rule

4(a)(3) was also jurisdictional. 

The two circuits employing the "rule of practice"

approach to have reconsidered this issue after Torres have 

either expressly held that Torres rendered the cross-appeal 

time limit jurisdictional or have stated as much in dicta.

See EF Operating Corp. v. American Bldgs., 993 F.2d 1046, 

-20- 20

1049 n.1 (3d Cir. 1993) (holding that the cross-appeal time

limit is jurisdictional); Stockstill v. Petty Ray 

Geophysical, 888 F.2d 1493, 1496-97 (5th Cir. 1989) (stating 

in dicta that it is "doubtful" whether cases adopting the

rule of practice approach remain good law after Torres). We 

agree, post-Torres, that the cross-appeal time limit in 

Federal Rule of Appellate Procedure 4(a)(3) is mandatory and

jurisdictional.4 See also Fed. R. App. P. 26(b) ("[T]he 

court may not enlarge the time for filing a notice of appeal,

a petition for allowance, or a petition for permission to

appeal.")

A notice of appeal must be filed with the clerk of

the district court within 30 days after the date of entry of

the judgment or order appealed from. Fed. R. App. P.

4(a)(1). A cross-appeal must be filed within 14 days after

the date when the first notice of appeal was filed or within

 

4. Although the core holding in Torres has been superseded 
by the 1993 amendments to the Federal Rules of Appellate
Procedure, see Fed. R. App. P. 3(c) ("An appeal will not be 
dismissed . . . for failure to name a party whose intent to
appeal is otherwise clear from the notice."); Garcia v. Wash, 
20 F.3d 608-09 (5th Cir. 1994) (per curiam), the advisory
committee notes to that amendment state that the amendment
was intended to put an end to the satellite litigation over
whether an ambiguous reference to a party was sufficient to
identify an appellant under Torres. Fed. R. App. P. 3(c) 
advisory committee's note. The amendment does not indicate
any intent to change the mandatory nature of the time limits
in Rules 3 and 4. Nor has there been any corresponding
amendment to Rule 26(b), which prohibits courts from
enlarging the time for filing a notice of appeal and upon
which the Torres court in part relied. 

-21- 21

the time otherwise prescribed by Appellate Rule 4(a). Fed.

R. App. P. 4(a)(3). Under the provisions of Appellate Rule

4(a)(4), the timely filing of certain types of motions, such

as motions under Federal Rules of Civil Procedure 50(b) or

59, will extend the time for appeal for all parties, causing

the time limits to run from the date of the entry of the

order disposing of the last such motion outstanding.

The district court entered its judgment on May 24,

1995. But on June 8, 1995, the defendants timely served a

motion under Rules 50(b) and 59, thereby extending the time

available for filing an appeal. The district court entered

its orders deciding this motion on September 28, 1995. The

defendants timely filed their notice of appeal within 30

days, on October 25, 1995. But the Johnsons did not file

their cross-appeal until November 13, 1995, 19 days after the

defendants filed their notice of appeal. Their filing was

five days too late.

The plaintiffs' only argument would be to rely on

Dubian's October 11, 1995 Additional Motion for Judgment as a

Matter of Law or in the Alternative for New Trial or for

Amendment of Judgment to make their cross-appeal timely. The

district court did not dispose of this motion until November

-22- 22

16, 1995, potentially making the plaintiffs' cross-appeal

merely premature.5 

However, Dubian's October 11th motion did no more

than raise for a second time the same issue Dubian had raised

in his June 8th motion, an issue the court had decided

against him on September 28 namely, whether Dubian's

conduct in driving by the Johnson home repeatedly could form

the basis of Dubian's personal liability for intentional

infliction of emotional distress. As the Sixth Circuit has

written:

"[A] motion to reconsider an order
disposing of a [time tolling post-trial]
motion of the kind enumerated in Rule
4(a)[(4)] does not again terminate the
running of the time for appeal,". . .
unless a grant of the earlier post-trial
motion effectively results in a new
judgment and the motion to reconsider is
filed by the adversely affected party
requesting reinstatement of the original
judgment.

Moody v. Pepsi-Cola Metropolitan Bottling Co., Inc., 915 F.2d 

201, 206 (6th Cir. 1990) (quoting Dixie Sand and Gravel v. 

TVA, 631 F.2d 73-4 (5th Cir. Unit B 1980)) (citations 

omitted). See also Wright v. Preferred Research, Inc., 891 

F.2d 886, 889-90 (11th Cir. 1990) (per curiam) (same);

Acevedo-Villalobos, 22 F.3d at 389 (holding that a second 

 

5. Under Federal Rule of Appellate Procedure 4(a)(4), a
premature filing becomes timely upon the disposition of the
motion which made the filing premature.

-23- 23

motion to reconsider served within ten days of the denial of

the first motion does not extend the time period for filing a

notice of appeal from the underlying judgment). 

Since Dubian's second motion was, in effect, merely

a request for reconsideration of his earlier motion, it did

not toll the time for appeal and the Johnsons' cross-appeal

was not timely.

III. Conclusion III. Conclusion

We affirm the judgment of the district court. We

dismiss the Johnsons' cross-appeal for lack of appellate

jurisdiction.

In appeal No. 95-2318, costs are awarded to

Patricia and Frank Johnson. In appeal No. 95-2319, costs are

awarded to Tom Gilmartin, Jr.

So Ordered. 

-24- 24